[No. 29238.   Department One.   March 23, 1944.]

J. W. SEAVEY HOP CORPORATION, *Respondent*, v. THOMAS H. POLLOCK, *Appellant*, STANLEY H. HILL *et al., Defendants.*[1]

[1]Reported in 147 P. (2d) 310.

*Rigg, Brown & Halverson,* for appellant.

*LaBerge & Lyon,* for respondent.

JEFFERS, J.—This action was instituted in the superior court for Yakima county, by J. W. Seavey Hop Corporation, against Stanley H. Hill and wife and Thomas H. Pollock, to enforce specifically the delivery of hops, under and pursuant to the claimed provisions of a certain contract entered into April 9, 1942, by and between Stanley Hill and wife as sellers, and plaintiff corporation as buyer.

In the complaint, it is alleged that plaintiff is an Oregon corporation, having its principal place of business at Portland, Oregon; that the corporation does not transact business in Washington; that defendant Pollock is the owner of certain land in Yakima county (describing it), of which 17.66 acres is planted to hops; that Pollock leased this hop land to defendants Hill, by written lease dated April 9, 1942, which lease reserved to Pollock, as rental, seven thousand pounds of hops to be grown upon the land during 1942.

It is further alleged that on April 9, 1942, defendants Hill entered into a written contract with plaintiff; that, prior to the execution of the contract, plaintiff was advised of the existence of the lease between the defendants, and that Pollock was entitled as rental for the premises to seven thousand pounds of hops produced in 1942; that Pollock, in writing, consented to the execution of the contract between plaintiff and defendants Hill; that plaintiff, between April 21 and September 5, 1942, advanced to Hill $5,500.

It is further alleged that there was produced upon the land during 1942 eighty-five bales of hops, of the net weight of 15,571 pounds, which hops were stored by Hill and Pollock in the warehouse of H. R. Spinner Company, in Yakima; that plaintiff has demanded delivery of the hops, and has offered to pay the amount due under the contract, but delivery has been refused, for the reason that Pollock claims seven thousand pounds of the hops, notwithstanding

the fact that the ranch produced only 15,571 pounds of hops, that being less than the amount contracted to be sold to plaintiff under the contract. (The contract called for twenty thousand pounds of hops.)

It is further alleged that the total valuation of the hops, under the terms of the contract, is $6,384.10, and that plaintiff has tendered to defendants the sum of $884.10, being the difference between the contract price and the advancements made, which tender and demand have been refused.

We have set out this complaint in order that we may have before us the issues therein tendered and their effect on one of the questions hereinafter discussed.

Service of a copy of the summons and complaint was accepted by Pollock on November 30, 1942. On December 8, 1942, all of the parties entered into a stipulation and agreement, which provides, in part, as follows:

"WHEREAS, this action involves the right of the plaintiff to the possession of 15,571 pounds of hops produced upon the land described in plaintiff's complaint, and

"WHEREAS, the defendant, Thomas H. Pollock, claims that he is entitled to 7,000 pounds of said hops, and

"WHEREAS, it is the desire of the parties hereto to avoid any loss which might arise by reason of holding said hops until the termination of this litigation and plaintiff has offered to deposit in the registry of this court the sum of $8,750.00 to be held in lieu of said 7,000 pounds of hops [hops went to one dollar a pound in September, 1942; to $1.25 a pound in October; and $1.50 a pound in November], on condition that all of the hops produced upon said land as above set forth shall be delivered to the plaintiff;

"Now, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the plaintiff and the defendants as follows:

"1. That the plaintiff will deposit into the registry of this court the sum of $8,750.00 in cash, and shall pay outstanding checks and hop tickets issued by defendant Stanley H. Hill in the sum of approximately $563.00, said sum to be taken into consideration by the court in the event that the plaintiff shall prevail herein.

"2. That all of the hops produced upon said land, consisting of 85 bales, shall be delivered to plaintiff.

"3. That said sum of $8,750.00 shall be held in the registry of this court until the final determination of this action.

"4. In the event the plaintiff shall prevail in this action, then the court shall award to the defendant, Thomas H. Pollock, such sum as he shall be entitled to receive if any, less plaintiff's costs and disbursements herein, and shall award the balance of said money to the plaintiff herein.

"5. That the defendants, Stanley H. Hill and Hazel Vail Hill, husband and wife, shall take nothing by this action.

. . .

"7. That in the event the defendant, Thomas H. Pollock, shall prevail in this action, then the court shall award to him the full sum of $8,750.00, together with his costs and disbursements."

Paragraph 8 provides:

"In entering into this stipulation and agreement, it is particularly understood and agreed that none of the parties hereto shall waive any of their legal rights and that this action shall be tried upon its merits and decision rendered without reference to this stipulation and without prejudice to any of the parties to this litigation by reason of the execution of this stipulation and agreement, except as hereinabove specifically set forth."

On December 10, 1942, plaintiff and defendant Pollock entered into a further stipulation, which supplemented the stipulation of December 8th in the following particulars:

"WHEREAS, by stipulation and agreement dated December 8, 1942, said hops [85 bales] were to be delivered to the plaintiff upon deposit of the sum of $8,750.00, and

"WHEREAS, in pursuance of said stipulation and agreement said hops have been inspected and weighed and it has been determined that two bales thereof were slack dried and have perished and are of no value whatsoever, and have been rejected by the plaintiff;

"Now, THEREFORE, IT IS HEREBY STIPULATED AND AGREED that the net weight of the hops so delivered to plaintiff is 15,189 pounds, instead of 15,571 pounds, and that the number of bales is 83 bales instead of 85 bales.

"IT IS FURTHER STIPULATED AND AGREED that the amount of the outstanding checks and hop tickets to be paid by the plaintiff is $504.77 instead of $563.00 . . .

"IT IS FURTHER STIPULATED AND AGREED that whereas, plaintiff deposited in the registry of this court the sum of $884.10, as a tender at the time of the commencement of this action, that the plaintiff shall deposit an additional sum

of $7,865.90, and that the total sum of $8,750.00 shall remain in the registry of this court pursuant to said stipulation and agreement of December 8, 1942."

On January 8, 1943, defendant Pollock served his answer and cross-complaint upon plaintiff. By his answer, Pollock admitted that plaintiff is an Oregon corporation; that he is the owner of the land upon which the hops were grown; that he leased the hopyard to Hill and wife, for the term of one year, from April 1, 1942, reserving as rental seven thousand pounds of hops; that Hill and wife entered into the written contract with plaintiff dated April 9, 1942, referred to in the complaint; that plaintiff advanced to Hill under the contract $5,500; that eighty-five bales of hops, 15,571 pounds (changed by stipulation of December 10th to eighty-three bales, or 15,189 pounds), were produced on the place in 1942; that the hops were stored in the Spinner warehouse by Hill and Pollock. Pollock also admitted a demand for the hops and a tender of $884.10.

By his answer, Pollock denied that plaintiff is not doing business in the state of Washington; that he (Pollock) ever consented to a sale to plaintiff of his seven thousand pounds of hops. Defendant then set up four affirmative defenses and cross-complaints. The substance of the first affirmative defense is that the hop contract is ambiguous, uncertain, and indefinite, and that oral evidence is necessary to show in truth and in fact that the contract does not and was never intended to include Pollock's share of the crop, to wit, the seven thousand pounds of baled hops reserved to the lessor under the lease.

The substance of the second affirmative defense is that, if the hop contract is in any way binding upon defendant, the same does not speak the true intent of the parties; that the same was signed by all the parties as the result of a mutual mistake, to wit, all of the parties at the time the contract was signed considered that the hopyard would produce thirty thousand pounds of hops; that by the contract Hill intended to sell and plaintiff intended to buy only Hill's share of the crop, and that, by signing or consenting

to the contract, Pollock intended to release any claim or lien which he might have against Hill's share of the crop only; that it is necessary that the contract be reformed to speak the true intent of the parties, and to limit the same to Hill's share of the crop.

The third affirmative defense is based upon alleged misrepresentations made by Mr. Schott, as agent for plaintiff, to induce defendant to consent to the contract, which statements were relied upon by defendant.

The substance of the fourth affirmative defense is that plaintiff, by reason of its intentional misleading statements and representations, is estopped and precluded, under the contract, from in any way asserting or claiming any lien or interest in or to defendant's share of the crop, to wit, seven thousand pounds of baled hops.

On January 15, 1943, an order of default was entered against Hill and wife.

On February 2, 1943, Pollock was granted permission to file an amended answer and cross-complaint, which contains the same admissions, denials, and allegations as the original answer and cross-complaint, with the addition of a fifth affirmative defense, in which it is alleged that plaintiff is an Oregon corporation, and that, at all times mentioned in the instrument, plaintiff was doing business in the state of Washington; that it has failed to comply with the laws of this state relating to foreign corporations doing business within this state, and has failed to pay its annual license fee, or any fees, to the state of Washington.

Plaintiff by its reply admitted the allegations of the answer and cross-complaint not inconsistent with the allegations of the complaint, and denied the other allegations.

The cause came on for hearing before the court, and thereafter, on August 5, 1943, the court made and entered its decree in favor of plaintiff and against defendant Pollock in the sum of $8,750, and directed the clerk to pay to attorneys for plaintiff the sum of $8,750 theretofore deposited by plaintiff under the stipulation of December 8th. Defendant

Pollock's motion for new trial was denied, and this appeal followed.

Appellant's assignments of error are: (1) In holding that appellant waived his right or was estopped from defending on the ground that respondent was a foreign corporation transacting business within the state, without complying with the laws of the state of Washington; (2) in refusing to dismiss respondent's complaint; (3) in refusing to hold that respondent had no legal capacity to sue; (4) in holding appellant's share of the crop was subject to the contract between respondent and Hill and wife; (5) in denying recovery to appellant, and in entering judgment against appellant.

The trial court, as indicated by its memorandum decision, concluded that respondent corporation was transacting business within the state of Washington, and that it had not qualified so to do, as required by our statutes; but the court also concluded that appellant Pollock was estopped from raising the question of the right of respondent, as a foreign corporation, to bring this action. However, the trial court also concluded that respondent was entitled to delivery of all the hops produced on the Pollock place in 1942 (15,189 pounds), under the contract hereinbefore referred to.

While we are inclined to the view that the trial court was justified in concluding from the evidence that respondent was transacting business within the state of Washington, this question becomes immaterial, and we do not pass upon it, for the reason that we agree with the conclusion reached by the trial court that appellant waived his right to raise this question, or is estopped from raising it.

In order that we may have the general background of respondent's operations in this state, we think a statement of the following facts pertinent:

Respondent, as has been stated, is an Oregon corporation, with its principal place of business at Portland. Its principal business is raising, buying, and selling hops in Oregon, and buying hops in Washington. The corporation has been

buying hops in Washington for a number of years, and during those years has followed about the same course of conduct, as hereinafter set forth. It sold no hops in Washington, and according to the testimony of Mr. Seavey, president of respondent, all hops purchased in Washington were bought for sale outside the state, upon orders previously procured. Since about 1937, one Harry Schott has been contacting most of the growers on behalf of respondent, and has, on orders from respondent, procured contracts with growers for the sale of their hops. These contracts were apparently prepared by Mr. LaBerge, an attorney of Yakima, on information furnished by Mr. Schott. After the contracts were prepared, they were submitted by Mr. Schott to the grower, and, if satisfactory to him, signed by the grower, and then sent to Portland to be signed by respondent, or in some instances, signed in Yakima county by Mr. Schott, as agent for respondent. After the contracts were signed, they were filed in Yakima county. In practically all instances in which hops were bought on contract, chattel mortgages were taken by respondent to protect advancements made under the contract, and to insure the carrying out of the terms of the contract. Under these contracts, respondent agreed to make certain advancements to the grower during the growing and picking season, and many thousands of dollars were advanced by respondent during 1942 and previous years.

It was respondent's practice to inspect the hops upon which it had a contract, during the growing season and until the crop was picked, to see that they were being properly taken care of, and in order to be sure that advancements made were protected and whether or not further advancements should be made. This inspection was usually done by Mr. Schott, or some officer of the company who would go to Yakima from Portland. Respondent, through its representative, would instruct the grower about picking the hops. Under the chattel mortgages, if the grower did not properly care for the hops, as provided for in the contract, respondent was authorized to enter upon the premises

and take all means and measures for the care and protection of the crop, and could retain possession thereof and harvest, gather, and prepare the same for market, if the grower failed carefully to tend and protect the crop.

In 1942, which is the time covered by the contract here in question, respondent purchased about four hundred thousand pounds of hops in Washington, which was about one-third of all hops handled by it that year.

While respondent's testimony is to the effect that Harry Schott was not its agent, but was only a broker buying hops for respondent on order, for which he received a commission of one-half cent a pound, there was introduced in evidence, as exhibit 39, a card bearing the name "J. W. Seavey Hop Co., 514 New Fliedner Building, Portland, Oregon; Harry L. Schott, Representative, P. O. Box 874, Yakima, Wash., Phone 4001." Mr. Seavey testified that respondent had no agent in Washington, owned no property in Washington, maintained no office in Washington, and, as we have said, sold no hops in Washington. The contracts provide that the seller will deliver the hops to the buyer on board cars or in a warehouse, at a place to be designated by the buyer. The testimony shows that the hops were in most instances delivered to the buyer at a warehouse, where, after being inspected and weighed by a representative of respondent, they were accepted by respondent, and thereafter held by respondent in Yakima county until shipped out to some person or corporation to whom respondent had sold them. Samples of the hops would be taken by Schott and sent to Portland, in order that respondent might determine the quality thereof.

It is thus apparent that the purchase of hops with which we are here concerned is no isolated transaction, nor is the purchase of hops by respondent in Washington merely incidental to its business; such purchases are a necessary part of its business.

We now come to the question of whether or not appellant has waived, or is estopped from raising, the question of respondent's right to bring this action.

Our conclusion that appellant is estopped from raising this question is based upon the stipulation of December 8, 1942, and what then appeared to be the issue to be determined in order to entitle either respondent or appellant to the money to be deposited in court in lieu of appellant's seven thousand pounds of hops. It should be borne in mind that, at the time this stipulation was entered into, no answer had been filed or served by appellant. As the record then stood, and as the stipulation states, this action involved respondent's right to the possession of 15,571 pounds of hops produced on the land owned by Pollock, the latter claiming that he was entitled to seven thousand pounds of the hops as rental. Having this situation in mind, let us now look at the stipulation.

Appellant contends that he did not waive his right to question respondent's right to sue, and that the stipulation so provides; that the only way he could raise the question was by his answer, as the complaint on its face was not demurrable. It may be admitted that the complaint was not demurrable, and that the question of respondent's right to sue could be properly raised by the answer.

The particular part of the stipulation referred to by appellant is paragraph eight, which provides in part as follows:

"In entering into this stipulation and agreement, it is particularly understood and agreed that none of the parties hereto shall waive any of their legal rights . . . "

It may be admitted that the above quoted portion of the stipulation would seem to uphold appellant's contention, but following the portion of paragraph eight above set out, we have the following words: *"and that this action shall be tried upon its merits."* Considering the situation then confronting the parties, what did the parties intend when they said, "this action shall be tried upon its merits"? It seems to us there is no doubt they had reference to a trial which would determine whether under the contract respondent was entitled to all of the hops produced on the land, or to the share of the lessee Hill only, or in other words, 15,571 pounds less the seven thousand pounds

claimed by Pollock as rent. That was and is the real issue in this case, and, in our opinion, it was only upon a determination of that question that the money deposited in court was to be awarded to either respondent or appellant.

The entire stipulation must be considered in determining the question now before us, and it seems to us that it was the intention of the parties, as indicated by the language of the stipulation itself, that, when the parties provided for a trial on the merits, they contemplated a trial which would determine the issue above presented, and not the issue of whether or not respondent had the capacity to sue.

Appellant also argues that the stipulation provides that this action shall be tried and decree rendered without *reference* to this stipulation, and without prejudice to any of the parties to this litigation. The stipulation does so provide, but appellant must rely and is relying upon the stipulation, in part at least, for his right to recover the $8,750. As stated by the trial court in its memorandum decision:

"It seems hardly equitable to say that the stipulation was used to bring the money into court, but it is not to be considered thereafter for any purpose, and if it is to be used for other purposes, it must be considered as a whole, except as to the limitations in the instrument itself. These limitations are set out in paragraph 8 of the stipulation above quoted.

"The first limitation, namely, that none of the parties waive their legal rights, if considered alone, would preclude the court from refusing to decide the question of the plaintiff's right to maintain its action; but the first part of the sentence must be read in connection with the second part; otherwise the second part would be without meaning.

"It seems to the court that the parties, by their stipulation, intended to submit the merits of the case for decision, or, at least, that the plaintiff had a right to assume that such was the intent, and that having obtained the benefits of the agreement, the defendant [Pollock] is precluded from raising the issue now under consideration. Whether the result is one of estoppel, or one of waiver, is not important."

Respondent's position was certainly changed as the result of this stipulation, for it paid the $8,750 into court, and also paid some outstanding checks and hop tickets.

348

■ We are satisfied no question of jurisdiction is here presented which may not be waived by appellant, the court having jurisdiction of the parties and the subject matter.

In *Procter & Gamble Co. v. King County*, 9 Wn. (2d) 655, 115 P. (2d) 962, we stated:

"We have consistently held that statutes providing that no corporation shall commence any action in this state without alleging and proving that it has paid its annual license fee, refer only to corporations doing business within this state, and do not apply to a nonresident corporation simply bringing an action in this state, as that does not constitute doing business within this state.

"We have never held that a foreign corporation must prove that it is not doing business within this state in order to maintain an action in the state courts."

Under the above decision, there can be no doubt that, under the complaint herein, which alleged that respondent was a foreign corporation not doing business within the state, the court had jurisdiction to hear the case and enter judgment, without proof that respondent had paid an annual license fee, and without proof that it had filed its articles of incorporation, etc. We are entirely in accord with the conclusion reached by the trial court that appellant waived or is estopped from raising the question of respondent's right to maintain this action.

The next question presented is whether or not the hop contract entered into between respondent and the Hills covered appellant's share of the crop, to wit, the seven thousand pounds which was reserved under his lease with Hill. The trial court concluded that the contract covered all the hops grown on the Pollock land in 1942, to wit, 15,189 pounds, or eighty-three bales. We appreciate the careful consideration given by the trial court to this question, but we are unable to agree with its conclusion.

■ May we say here that we are mindful of the general rule that parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident, or mistake. But, as stated in *Olsen v. Nichols*, 86 Wash. 185, 149

Pac. 668, parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty of the court to declare the meaning of what is written, and not what was intended to be written. If the evidence goes no further than to show the situation of the parties and the circumstances under which the instrument was executed, then it is admissible.

In *Standring v. Mooney,* 14 Wn. (2d) 220, 127 P. (2d) 401, we quoted with approval from 16 Am. Jur. 687, § 445, as follows:

" 'There are certain situations in which parol evidence is admissible. Parol evidence is admissible to show the circumstances under which a deed was made and the relation of the parties to the contract of conveyance and to each other with respect to it. Parol evidence of the surrounding circumstances will be received and taken into consideration in order to ascertain whether the document under consideration is a deed or a contract for the sale of property. A parol agreement in pursuance of which a deed is executed is frequently admissible in evidence. The purpose for which property is conveyed to, and is used by, a religious society may be shown by parol if it is not set out in the title papers.' "

The contract here in question was entered into between Hill and wife as seller, and respondent corporation as buyer, on April 9, 1942, and provides in part as follows:

"In consideration of the sum of One and no/100 Dollars ($1.00) paid to the seller by the buyer, the receipt of which is hereby acknowledged, and of the promises herein contained on the part of the buyer to be performed, the seller does hereby sell and agrees to deliver to the buyer twenty thousand pounds (20,000 lbs.) net weight *of his crop of hops*

of the growth of the year 1942, now growing on the following described real estate [description] . . .

"The seller further agrees that he will not tender any part of the hops grown on said land for inspection or delivery on any other contract, or make any sale thereof until the hops sold under this agreement shall have been delivered, and that this agreement shall have preference both as to quality and quantity over all other contracts or sales relating to the hops grown on said lands." (Italics ours.)

After the signatures of the Hills and the corporation appears the following:

"The undersigned, lessor of the above described premises, does hereby consent to the above and foregoing contract to the extent of 20,000 pounds of hops grown upon said premises.                    THOMAS H. POLLOCK"

■ The situation and relationship of the parties at the time the contract was executed are shown by the following testimony:

Shortly prior to April 9th, Hill had been contacted by Schott, representing respondent, in regard to the sale of his hops. Hill explained to Schott that he did not want to make any contract without Pollock being present. As a result of this conversation, Schott got in touch with Pollock, who was out on the range, and it was agreed the parties would meet in the Roza hotel, in Yakima. On April 9, 1942, Schott, Hill, and Pollock met at the appointed place, and, during the conversation between the parties, Schott produced the contract now before us, which he had had Mr. LaBerge prepare. Mr. Hill examined the contract, and stated that it seemed to be O. K., and it was then handed to Pollock, who read it and called attention to the sliding scale of prices depending on leaf, stem, and seed analysis. We quote from Mr. Pollock's testimony:

"So Stanley [Hill] says, 'Tom, I'm satisfied.' Well, I told him—I says, 'Stanley, it don't look good to me. If you had a fixed price, it would be a better deal.' So then I told him if he was satisfied, it was his share of the crop he was contracting; and I put the question to Mr. Schott, 'Why should I sign the Seavey contract?' and he said, 'You being owner

of the yard.' Then I said, 'Mr. Schott, I'm not putting my signature to it until I interview my attorney;' and he said, 'There's no call for that.' So I told him if I signed it that I would give no guarantee of the tonnage to Stanley Hill, whether a hundred bales or fifty bales. I said the purpose of signing it was to approve of Stanley Hill to sell his share of the crop only."

Mr. Pollock further testified that he asked Mr. Schott this question:

" 'If I sign the Seavey contract, does this involve my hops in any way?' and he said, 'No, but will you give me a chance to buy?' "

Mr. Pollock did not see an attorney, but he left the meeting, went out and had a stenographer prepare a lease. He then went back to the meeting, where he produced his lease, and it was read. After this, according to Mr. Pollock, they all went to the office of Miss Ross, where the papers were signed by Hill and Pollock. They then went to the Hill ranch, where Mrs. Hill signed the lease and the contract. Mr. Schott signed as a witness to the lease, and testified that he read it and knew that it called for seven thousand pounds of hops to be delivered in the bale to Mr. Pollock, as rental. After the contract was signed, it was sent to Portland, where it was signed by the corporation, after which it was returned and filed in Yakima county.

Stanley Hill also testified that before Pollock signed the contract he said to Schott: " 'Does this involve my hops?' and Harry Schott says, 'No.' " Hill also testified that Pollock left the meeting at the Roza hotel, and when he came back he produced the lease, which was read by Hill and then by Schott, and that Schott remarked that Hill was giving Pollock more pounds than Hill's brother, who had been on the Pollock land the year before, had given Pollock. He also testified that they all went to the office of Miss Ross, where the papers were signed, except for the signatures of Mrs. Hill and the corporation.

Mrs. Hill testified that, when the three men came to the ranch, the papers were all signed and notarized, except for her signature.

All of the parties knew that the Pollock hopyard had produced about thirty thousand pounds of hops in 1941, and that that amount was about the normal yield for that yard. Mr. Schott had bought Mr. Pollock's share of the crop for respondent in 1941. While it does not appear that the question of how many hops this place would produce was discussed, there can be no question but that all of the parties knew that the normal production of the yard was about thirty thousand pounds of hops. Mr. Schott denied that Pollock ever asked him if his (Pollock's) share of the crop was included in the contract. He also testified that both the contract and the lease were signed by all the parties at the Hill ranch; that he never saw the lease until after the contract had been signed, at which time Pollock produced the lease and asked Mr. and Mrs. Hill to sign it, which they did, and then Pollock asked Schott to sign as a witness, which he did, after reading the same. The lease was filed for record on December 14, 1942, and, under Rem. Rev. Stat. (Sup.), § 1188-4 [P. C. § 9666-4], this was in time to give notice of Pollock's claim of lien, as landlord, on the crop.

Apparently after the papers were signed, no further thought was given by any of the parties to the effect of the contract, until sometime after a storm which occurred in May, and which materially damaged the hops. Schott testified that, at about the time the hops were ready to pick, at which time it appeared that there would not be twenty thousand pounds produced on the place, Hill told him it was his belief that Pollock's share of the crop would have to go under the Seavey contract. Hill denied that he ever made any such statement, and testified that, when Schott came out to give him a check for the last advancement, Schott asked Hill if he knew that Pollock's hops had to come in on the contract. It appears that at about this time Schott had asked Mr. LaBerge to examine the contract, apparently for the purpose of determining whether or not Pollock's share of the crop could be held under the contract.

The first time Mr. Pollock knew that respondent was claiming that the contract covered his share of the crop was when he was called by Mr. Schott in September, after the hops were picked, and was informed that the crop was short and that Pollock's share would be taken in on the contract at the contract price, to which Pollock objected. Pollock was then called to the office of Mr. LaBerge, where he was informed that respondent was claiming all the hops under the contract. Again Mr. Pollock objected to his share of the crop being taken.

There is some testimony that Mr. Schott, at the meeting in the Roza hotel and on the way to the Hill ranch, stated that he would like to buy Pollock's share of the crop, but Pollock told him he was not ready to sell.

We are convinced by this testimony that the words "his crop of hops," as used in the contract, meant Hill's share of the crop of hops to be raised on the Pollock place in 1942. While undoubtedly it was assumed that Hill's share would be twenty thousand pounds, whether it was twenty thousand pounds or less, all that is covered by the contract is Hill's share, which would be 15,189 pounds, less the seven thousand pounds reserved by Pollock under his lease.

We are just as certain that all Pollock approved and consented to was Hill's right to contract to sell his share of the crop.

It seems to us that the terms of this contract can mean nothing else, when considered in the light of the situation and relationship of the parties at the time the contract was executed, to say nothing of the subsequent actions of the parties. We are of the opinion that the testimony which we have set out does not tend to modify or contradict the terms of the contract, but was admissible for the purpose of aiding in the interpretation of the instrument itself and Pollock's approval of the contract.

We are of the opinion, as was the trial court, that Schott was respondent's agent for all purposes, in so far as the hop contract and lease is concerned, and that respondent is bound by any representations made by Schott,

and is charged with knowledge of all the facts known to Schott.

For the reasons herein assigned, it follows that Pollock must prevail in this action, and, under paragraph seven of the stipulation, is entitled to have awarded to him the $8,750 deposited in court in lieu of the seven thousand pounds of hops.

The judgment of the trial court is reversed, with instructions to enter judgment against respondent in the sum of $8,750. It is the further judgment of this court that the clerk of the superior court for Yakima county be directed to deliver to appellant or his attorneys the sum of $8,750 deposited in court by respondent; and that, upon the payment of the $8,750 to appellant or his attorneys, together with costs, appellant enter a satisfaction of this judgment.

SIMPSON, C. J., BEALS, and STEINERT, JJ., concur.

BLAKE, J., dissents.

May 2, 1944. Petition for rehearing denied.

