**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

In the Matter of the Marriage of

ERIN MCCARTHY,

                 Respondent,

       and

ALAN ADAMS,

                 Appellant.

No. 85511-5-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — In this marriage dissolution proceeding, Alan Adams appeals the trial court's property distribution. Specifically, he argues that the court mischaracterized his business, Navazon, as community property based on the parties' prenuptial agreement. We disagree and affirm.[1]

I

Alan Adams and Erin McCarthy began dating in August 2015 and moved in together in July 2016. Around the same time Adams and McCarthy began dating, Adams founded a consulting business, Navazon Consulting LLC (Navazon). Navazon

---

[1] In a letter submitted two days before oral argument, McCarthy notified this court of a trial court order entered September 6, 2024, denying in part and granting in part Adams's CR 60 motion. The trial court found a clerical mistake under CR 60(a) in valuing the marital residence. The trial court determined the mistake did not change the ultimate property division. We decline to supplement the record as the information is not properly before us and does not change our decision.

provides expertise in e-commerce strategies, including teaching businesses to successfully market their products on Amazon.com.

Adams and McCarthy married in October 2017. Before the marriage, Adams told McCarthy that he wanted a prenuptial agreement (agreement). Adams's attorney prepared the first draft of the agreement and McCarthy obtained independent counsel. The parties signed the agreement about a week before their wedding.

Adams and McCarthy agreed "that any and all property acquired in both of their names hereafter, as well as any property, currently held in both of their names shall be community property from and after the date of the marriage." They also agreed that "earnings and wages resulting from either party's employment after the date of marriage, together with all property acquired with or income derived therefrom, shall be community property from and after the date of their marriage."

The agreement also provided that upon dissolution, "community property will be divided equitably between the parties and one-half (1/2) of the property shall thereafter belong to each party unless otherwise court-ordered."

The parties made a "full disclosure to the other party of all his or her property and assets and of the value thereof." The parties each listed the nature, extent, and value of their respective assets and liabilities, McCarthy in Schedule A and Adams in Schedule B.

Throughout Schedules A and B, the parties listed their assets and expressed their plans as "[Wife/Husband] to be wishes to retain separate ownership of this property" or "[Wife/Husband] to be wishes to create joint ownership of this property with [Husband/Wife] to be upon their marriage." Under the agreement, McCarthy would

retain separate ownership of three bank accounts and several retirement accounts. Adams would retain separate ownership of four bank accounts, a vehicle, four retirement accounts, and stock options.

For Navazon, the agreement provided, "Husband wishes to create joint ownership interest with in this business with Wife after marriage." Adams also specified that for Navazon's two business accounts: "Husband to be wishes to create joint ownership of this property with Wife to be upon their marriage." McCarthy testified that her understanding at the time she signed the Agreement was that "we would jointly own Navazon together."

During the marriage, Navazon grew, realizing over $3 million per year in gross profit.[2] McCarthy helped Adams with Navazon while working full-time for the Bill and Melinda Gates Foundation. McCarthy helped Adams prepare for learning seminars, developed agendas, prepared requests for proposals for hotels to host seminars, handled logistics, and wrote Adams's talking points. As Navazon grew, McCarthy reviewed Adams's communications, helped him prepare speeches, prepared briefing on a potential acquisition, booked Adams's travel, helped with presentations, helped staff, and reviewed internship resumes.

The parties separated in November 2020. McCarthy petitioned to dissolve the marriage.

At trial, McCarthy asked the trial court to enforce the agreement while Adams asserted that the Agreement was not valid or fair. McCarthy argued that, under the

---

[2] Each party hired an expert witness to prepare a valuation report on Navazon. The court deemed McCarthy's expert witness Douglas McDaniel's report more credible than Adams's expert witness.

agreement, Navazon was community property. The trial court found and concluded that "both parties had the opportunity, and took advantage of the opportunity, to consult with legal counsel prior to entering the prenuptial agreement. . . . [a]ccordingly, the prenuptial agreement is valid and enforceable."

In interpreting the agreement, the trial court found "and conclude[d] that the word 'wishes,' as used in the parties' prenuptial agreement evidences their clear, distinct, and unequivocal, expressions of how they intended for their debts and assets to be characterized upon entry of the marriage." As for Navazon, the trial court concluded:

> The Business-Navazon Consulting LLC section of the parties' prenuptial agreement indicates that joint ownership interest for Ms. McCarthy would be created in Navazon Consulting LLC, which I find and conclude is now Navazon, Inc. dba Navazon (Navazon), after marriage. See Exhibit 1, page 17. The evidence is unclear as to what exactly was meant by the words "joint ownership interest." However, a review of other characterizations identified in Schedule B show that Mr. Adams clearly identified assets and debts that were intended to remain separate property. Further, the language contained in the Business-Navazon Consulting LLC does not support such a designation. See Exhibit 1, pages 16-18. In fact, the Business-Navazon Consulting LLC section, when viewed along with the parties' stated intentions in the remainder of the prenuptial agreement, supports the finding and conclusion that any ownership interests Mr. Adams has in Navazon is community property. See Exhibit 1.

(Emphasis added.)

The trial court entered detailed findings and conclusions of law. The trial court awarded Adams and McCarthy each their separate property, $1,956,610 and $577,830 respectively. The trial court valued the total marital community at $5,877,636. It awarded Navazon, valued at $3,665,500, to Adams and $2,212,136 to McCarthy. To equalize the division, the trial court ordered Adams to make a $726,682 equalizing

payment to McCarthy. The trial court awarded a net total of $2,521,053 to Adams and $2,062,136 to McCarthy in community property.

Adams appeals.[3]

II

"Prenuptial agreements are contracts subject to the principles of contract law." In re Marriage of DewBerry, 115 Wn. App. 351, 364, 62 P.3d 525 (2003). "A pre-nuptial agreement freely and intelligently made is generally regarded as conducive to marital tranquility and the avoidance of disputes about property in the future." Friedlander v. Friedlander, 80 Wn.2d 293, 301, 494 P.2d 208 (1972).

We review the trial court's conclusions of law pertaining to contract interpretation de novo. Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). "It is the duty of the court to declare the meaning of what is written, and not what was intended to be written." Berg v. Hudesman, 115 Wn.2d 657, 669, 801 P.2d 222 (1990) (quoting J.W. Seavey Hop Corp. v. Pollock, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944)).

To interpret the contract, we give its words their ordinary, usual, and popular meaning unless the entirety of the agreement demonstrates a contrary intent. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). "An interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective." Snohomish County Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc., 173 Wn.2d 829, 840, 271 P.3d 850 (2012).

---

[3] McCarthy originally filed a cross-appeal but later moved for voluntary dismissal.

And we "view the contract as a whole, interpreting particular language in the context of other contract provisions." Viking Bank, 183 Wn. App. at 713.

A

Adams first argues that the agreement did not create joint ownership of Navazon because stating the wish to do so at an unidentified time after marriage did not create an enforceable legal right. Adams urges this court to treat "upon their marriage" and "after marriage" differently. We disagree.

The character of property as separate or community is determined at the date of acquisition. In re Estate of Borghi, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property. Borghi, 167 Wn.2d at 484. "[T]he evidence must show the intent of the spouse owning the separate property to change its character from separate to community property." Borghi, 167 Wn.2d at 484-85.

Adams concedes that the language "wishes to create joint ownership of this property . . . upon marriage" meant that the assets identified were transmuted from separate to community property when the marriage was performed. Adams also concedes that where the parties wanted to retain separate ownership of an asset, they used the language "wishes to retain separate ownership of this property."

Thus, if Adams wanted to retain the separate character of Navazon, he could have used that language. He did not do so. The trial court came to a similar conclusion: Adams "clearly identified assets and debts that were intended to remain

-6-

separate property" but the language regarding Navazon "does not support such a designation."

Adams asserts that the provision addressing Navazon does not include a condition precedent whose occurrence makes the precatory language "wishes" mandatory.

"A condition precedent is an event that must occur before there is a right to immediate performance of a contract." U.S. Bank Nat'l Ass'n v. Roosild, 17 Wn. App. 2d 589, 599, 487 P.3d 212 (2021). "[W]ords such as 'provided that,' 'on condition,' 'when,' 'so that,' 'while,' 'as soon as' and 'after' suggest a conditional intent, not a promise." U.S. Bank Nat'l Ass'n, 17 Wn. App. 2d at 599 (quoting Tacoma Northpark, LLC v. NW, LLC, 123 Wn. App. 73, 79, 96 P.3d 454 (2004)). The dictionary definition of "after" means subsequent to in time or order.[4] While "upon" means on.[5]

The parties' use of both terms, "after" and "upon," demonstrates their intent to form a condition precedent. And for both, the condition precedent was the happening of the marriage.

Viewing the agreement as a whole, this interpretation is consistent throughout. Viking Bank, 183 Wn. App. at 713. In separate provisions of the agreement, the parties used "after" and "from and after the date of marriage: "The earnings and wages resulting from either party's employment after the date of marriage, together will all

---

[4] MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/after (last visited Oct. 16, 2024).

[5] MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/upon (last visited Oct. 16, 2024).

property acquired with or income derived therefrom, shall be community property <u>from and after the date of their marriage</u>." (Emphasis added.)

Regarding the two Navazon business accounts at the time the agreement was signed, the agreement states: "Husband to be wishes to create joint ownership of this property with Wife to be upon their marriage." When read together, the plain language in the agreement supports an intent to transmute the character of Navazon from separate to community property. <u>Borghi</u>, 167 Wn.2d at 484.

B

Adams next asserts that the agreement alone cannot create a joint ownership interest in Navazon. This is so, he contends, because the parties never took any steps after the marriage to create a joint ownership interest in Navazon, and thus it remains separate property. We disagree.

Adams argues that while Navazon was an LLC, to change the ownership the operating agreement would need to be changed or the records of the LLC would need to reflect McCarthy's admission as a member. And once Navazon was incorporated, Navazon would have had to issue McCarthy stock in a manner consistent with its bylaws.

Adams errs by concluding that being the named owner is different from property being characterized as separate or community. The separate or community character of property is not determined by the name on a deed or title. <u>See Borghi</u>, 167 Wn.2d at 488 ("property taken in the name of one of the spouses may be the separate property of the spouse taking title, the separate property of the other spouse, or the community property of both of the spouses") (quoting <u>Merritt v. Newkirk</u>, 155 Wash. 517, 520-21

285 P. 442 (1930)). The agreement repeatedly used the phrase "joint ownership" and for, everything but Navazon, Adams concedes that this meant the asset was transmuted from separate to community property when the marriage was performed.

For these reasons, we conclude that the trial court correctly characterized Navazon as community property.[6]

III

Adams argues that the property distribution should be reversed. We conclude that the trial court properly considered the agreement and the RCW 26.09.080 factors in making its distribution.

In dissolution proceedings, the trial court has broad discretion to make a just and equitable distribution of all property based on the factors enumerated in RCW 26.09.080. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). "All property, community and separate, is before the court for distribution." In re Marriage of Doneen, 197 Wn. App. 941, 948, 391 P.3d 594 (2017).

When fashioning just and equitable relief, the court must consider (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the property distribution is to become effective. RCW 26.09.080. These factors are not exclusive and the trial court must consider "all relevant factors." RCW 26.09.080.

---

[6] Because we do not agree with Adams that Navazon was separate property, we do not address his arguments that the trial court erred in characterizing several additional assets based on a mischaracterization of Navazon.

Just and equitable does not mean that the court must make an equal distribution. Friedlander, 80 Wn.2d at 305. A trial court has considerable discretion in making a property division, and "will be reversed on appeal only if there is a manifest abuse of discretion." In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" Muhammad, 153 Wn.2d at 803 (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)).

The agreement provides, upon dissolution or separation:

> The community property will be divided equitably between the parties and one-half (1/2) of the property shall thereafter belong to each party unless otherwise court-ordered. It is the parties' intention that if any such property is not easily divisible that they will agree on the value of that property and allocate the total community property in a manner that accomplishes an equitable division, as they then agree. [7]

On appeal, Adams concedes that the trial court's valuation of Navazon falls within the range of evidence. Two expert witnesses testified to Navazon's value and it was for the trier of fact to determine which testimony was credible.

The trial court does not abuse its discretion by assigning value to a property where the value assigned is within the scope of the evidence. In re Marriage of Soriano, 31 Wn. App. 432, 435, 643 P.2d 450 (1982). We will not "substitute our judgment for the trial court's, weigh the evidence, or adjudge witness credibility." In re Marriage of Greene, 97 Wn. App. 708, 986 P.2d 144 (1999).

---

[7] For separate property, the agreement states: "Except as provided below, neither shall make any claim, and neither is entitled to, nor will receive, any of the separate property of the other." The trial court considered the agreement and concluded "all the parties' property characterized as separate property above, will remain separate property, and be distributed to the parties accordingly."

The trial court reviewed the factors of RCW 26.09.080 and the parties' agreement, including "the clause requiring that all their community property be equitably divided 50/50, and that their separate property remain separate."

In light of the overall distribution of assets and liabilities, the trial court did not demonstrate a failure to properly consider the statutory factors. See RCW 26.09.080. To the contrary, Adams was awarded 100 percent of his separate property, valued at $1,956,610, while McCarthy's separate property was valued at $577,830. The trial court valued the total marital community at $5,877,636. It awarded Navazon, valued at $3,665,500, to Adams and $2,212,136 to McCarthy. To equalize the division, the trial court ordered Adams to make a $726,682 equalizing payment to McCarthy. The trial court awarded a net total of $2,521,053 to Adams and $2,062,136 to McCarthy in community property.

We conclude that the trial court's distribution of property is within the range of acceptable choices, and the trial court did not abuse its discretion in dividing the parties' assets and liabilities.

Affirmed.

_Mann, J._

WE CONCUR:

_Díaz, J._

_Hazelrigg, ACJ_

-11-