[No. 15720–5–I.  Division One.  October 20, 1986.]

THE STATE OF WASHINGTON, *Respondent*, v. MARK RICHARD MOON, ET AL, *Defendants*, ROBERT RICHARD JONES, *Appellant*.

*Raymond H. Thoenig* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Ruth Robinson, Deputy,* for respondent.

GROSSE, J.—Robert Richard Jones appeals his convictions for first degree kidnapping and second degree robbery. He challenges both the propriety of the initial arrest and the trial court's exclusion of proffered expert testimony as to factors which affect the reliability of eyewitness identifications. We reverse.

The victim, Mrs. Fox, was abducted by two men at about 6 p.m., July 28, 1984, as she emerged from a grocery store in South Seattle. One of the men came up behind her, told her that he had a gun in his green knapsack, and directed her into her car. She got into the passenger seat while the man with the knapsack got into the driver's seat. The second man got into the backseat behind her at which point they drove off. During the drive, the driver directed Mrs. Fox to hand her wallet to the man in the backseat. She did so and at that point took a brief look at the face of the man in the back. Her wallet was returned after the cash and credit cards were taken from it. A short time later she was released from the car. She fled to a nearby house and contacted the police. She gave a detailed description of both abductors to the police once they arrived.

At 3 a.m. on August 5 a minimart in North Seattle was robbed by a man with a green knapsack and a knife. Investigating officers noticed an orange Toyota Celica automobile parked at a motel just a few minutes from the robbery

scene; an orange Toyota Celica automobile had been listed in a recent crime analysis bulletin as being involved in a series of robberies in the north end of Seattle. The officers stopped to investigate and found that the hood of the Celica was still warm. They went to the motel office and found that unit 12 was registered to Deborah Tangen. The Celica was parked in front of unit 12. A Department of Licensing check revealed that the Celica was registered to Deborah Tangen and a man. While waiting for the license check, officers stationed in the alley behind the unit heard loud voices from unit 12.

After the license check an officer knocked on the door. The appellant answered. The officer stated she was investigating a robbery and wished to speak with the owner of the Celica. Appellant made no comment about the car but stated the room was his and that he was alone. The officer then asked if she could enter; at that time officers in the alley saw someone's head protruding from the back bedroom window. Appellant consented to the entry. The officers entered and upon hearing noises from the bedroom proceeded there where they found Mark Moon and Deborah Tangen hiding in bed under the covers. Appellant, Moon, and Tangen were then kept together in the living room for about 20 minutes while the victim of the minimart robbery was brought to the scene. She identified Moon as the person who robbed her 45 minutes earlier. All three were then placed under arrest.

Two days later on August 7 a physical lineup was conducted which included appellant. Mrs. Fox made a tentative identification of appellant as the person who was in the backseat of the car when she was abducted. At trial Mrs. Fox made a positive identification of appellant as the person in the backseat of the car, stating that she recalled him from the incident rather than the lineup. At trial, appellant sought to introduce expert testimony as to the various factors which affect the reliability of eyewitness testimony, particularly the duration of the viewing and the stress during the time of the viewing. The trial court refused to admit

the proposed testimony after a detailed offer of proof by the expert.

■ Appellant first contends that his arrest was illegal and therefore the suppression of the lineup identification of him made by Mrs. Fox is required. The investigating officers of the minimart robbery were justified under the circumstances and facts known to them in holding all three persons while the victim of that robbery was brought to the scene.[1] The events leading to appellant's arrest may be properly characterized as an investigative detention similar to a *Terry* stop which may be justified under *State v. Williams,* 102 Wn.2d 733, 739–41, 689 P.2d 1065 (1984). The continued detention of appellant for the brief time necessary to bring the victim to the scene was reasonably related in scope to the circumstances which originally justified it; the amount of intrusion was not excessive since appellant was kept in the motel room while the victim was brought there and he was not searched or otherwise restrained in the interim; the investigation focused on the owner of the suspect car and the two males linked to it since the robber was a male; and the less than 20 minutes necessary to transport the victim to the motel room was not excessive under the circumstances. *See Williams,* at 740–41.

Once the victim identified Moon as the robber, the police also had probable cause to arrest appellant, though not because he was present in the motel room with Moon. *See State v. Dorsey,* 40 Wn. App. 459, 466–69, 698 P.2d 1109 (1985). With Moon identified as the robber, the circumstances here are sufficient to infer the necessary element of knowledge that a crime had been committed to arrest appellant for rendering criminal assistance under RCW 9A.76.050, a class C felony, since that is a logical explanation for appellant's two lies to the police immediately prior to his arrest. *See State v. Vannoy,* 25 Wn. App. 464, 472, 610 P.2d 380 (1980) (knowledge that a crime has been com-

---

[1]The record supports the trial court's finding that appellant consented to entry by the police. We affirm that finding.

mitted is an essential element of RCW 9A.76.080). Further, we are only concerned here with probable cause to arrest, which is not a technical inquiry. *Dorsey,* at 468–69. Appellant's arrest was proper; there is no poisoned fruit to suppress.

Appellant next argues that the trial court abused its discretion when it denied admission of the proposed expert testimony on factors affecting the reliability of eyewitness identification. He argues the error requires reversal since the only evidence tying appellant to the crime was the identification by Mrs. Fox which was made on the basis of one brief viewing when she was under great stress, and her initial detailed description is quite different from appellant's appearance. Thus the expert testimony is central to appellant's alibi defense.

ER 702 governs the admission of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will *assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Italics ours.) ER 702 is a verbatim transcription of Fed. R. Evid. 702. *See* Comment, ER 702. Three criteria govern admissibility under the rule: "whether (1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact." *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984). Admission of such evidence rests within the court's discretion. The underlying purpose of expert testimony is to assist the finder of fact in understanding the evidence and determining a fact in issue. ER 702; *State v. Kelly,* 102 Wn.2d 188, 195–96, 685 P.2d 564 (1984). *See* 3 J. Weinstein & M. Berger, *Evidence,* Rule 702 advisory committee note, at 702–1 to 702–2 (1985). *See also State v. Maule,* 35 Wn. App. 287, 294–95, 667 P.2d 96 (1983), discussing the evalu-

ation of expert testimony in a novel field under ER 702.

Washington courts have consistently upheld the trial court's exercise of discretion in admitting or excluding this kind of evidence. *See State v. Guloy,* 104 Wn.2d 412, 429–30, 705 P.2d 1182 (1985), *cert. denied,* 106 S. Ct. 1208 (1986); *State v. Cook,* 31 Wn. App. 165, 173–74, 639 P.2d 863 (1982); *State v. Barry,* 25 Wn. App. 751, 760–61, 611 P.2d 1262 (1980). The court implied in *Guloy* that there was no abuse in excluding such proffered expert testimony. In part this was because the eyewitness identification in that case was not the only evidence implicating the defendant. *Guloy,* at 430. None of the Washington cases have yet discussed when denial of the sort of expert testimony offered here would be prejudicial to a defendant. However, *Allery* states that the failure to admit relevant expert testimony central to the defense is prejudicial. *Allery,* at 596–97.

■ Reflecting a growing trend in applying the Federal Rules of Evidence or state counterparts,[2] other jurisdictions have recently found that the exclusion of testimony similar to that involved here is an abuse of discretion in a very narrow range of cases: (1) where the identification of the defendant is the principal issue at trial; (2) the defendant presents an alibi defense; and (3) there is little or no other evidence linking the defendant to the crime. *See State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208, 1222–24 (1983); *People v. McDonald,* 37 Cal. 3d 351, 690 P.2d 709, 208 Cal. Rptr. 236 (1984); *United States v. Smith,* 736 F.2d 1103 (6th Cir.), *cert. denied,* 469 U.S. 868 (1984); *United States v. Downing,* 753 F.2d 1224, 1231–32 (3d Cir. 1985). These courts' analyses of the rules of evidence, and our courts' interpretations of those rules, persuade us of the necessity of the above approach if we are to promote a

---

[2]Washington adopted its Rules of Evidence in 1979, also using the Federal Rules of Evidence as its model with few changes, none of which apply here. *See* Orland & Tegland, *The Federal Rules of Evidence: Washington Follows the Federal Model,* 15 Gonz. L. Rev. 277 (1980).

straightforward application of them.

In this case the trial court did not dispute the first two required factors under *Allery,* that the witness be a qualified expert and that the opinion be based upon accepted scientific theory. It also did not explicitly reject appellant's contention that the information would be helpful to the trier of fact; rather, the court stated it feared how defense counsel proposed to use it, and that the use of such testimony would invade the province of the jury by telling them whether or not to believe the witness who made the identification. However, such a fear should not be fatal to admission of relevant evidence central to the defense, in part because the trial court has broad discretion in placing limits on an expert's testimony. *See Harris v. Groth,* 99 Wn.2d 438, 448–51, 663 P.2d 113 (1983). Moreover, our cases recognize, even before the adoption of the modern rules, that an expert cannot usurp the jury's duty of deciding facts because the jury may always accept or reject the expert's evidence or opinion, in whole or in part. *See Gerberg v. Crosby,* 52 Wn.2d 792, 799, 329 P.2d 184 (1958), cited in *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.,* 106 Wn.2d 391, 399, 722 P.2d 787 (1986).

In this case, given the detailed offer of proof, it is difficult for us to see how such testimony would not have been helpful to the trier of fact. The only evidence against appellant was the eyewitness identification by Mrs. Fox. Some items were seized from the motel room after the arrest which had been in Mrs. Fox's car at the time she was abducted. They were never traced to appellant, but to codefendant Moon. Further, the discrepancy between Mrs. Fox's initial detailed description and appellant's actual appearance (brown hair as opposed to black; 5 feet 10 inches as opposed to 6 feet 3 inches; broad pockmarked mouth as opposed to moustached, thin mouth; 40 years old as opposed to 28) cries out for some logical explanation. The proffered testimony provides principles which would assist the jury to understand the facts of *this case,* as required by ER 702. *See Smith,* at 1106. The defense

expert testified, outside the presence of the jury, that the experimental data showed that a person's memory is more likely to be distorted by "postevent information . . . if the initial memory is impoverished in some way, if what gets stored initially is . . . poorly stored". According to the expert's testimony, factors which bear on whether the memory was poorly stored include whether the event was violent, stressful, brief or drugs were being used. There is an appropriate "fit" between the proposed expert testimony and the facts of this case since the victim here had a short stressful view of a man in the backseat of a car and was subject to "postevent information" in the form of the photo montage and live lineup. As in *Smith,* this evidence would not only have been relevant to the facts of the case and helpful to the jury, it might well "have refuted their otherwise common assumptions about the reliability of eyewitness identification." *Smith,* at 1106. It is not difficult to find that this type of evidence may be critical in some cases since its results are best described as counterintuitive; that is, contrary to the common understanding or belief of most people.

The only evidence linking appellant to the crime is the victim's identification. Thus we cannot say exclusion of the expert testimony was harmless, *see United States v. Sebetich,* 776 F.2d 412, 419 & n.10 (3d Cir. 1985); *cf. Smith* (defendant's palm print found in the bank undercut his alibi defense, making exclusion of similar expert testimony harmless), particularly given the many discrepancies between the victim's initial description and appellant's appearance. We note there was no similar discrepancy between Mrs. Fox's initial description of codefendant Moon's appearance, and that there were other direct evidentiary links of Moon to the crime.

In both *Downing* and *Sebetich* the Third Circuit remanded the cases to the trial courts to hold hearings on the admissibility of the expert testimony. However, the detailed offer of proof here, the trial court's acceptance of the witness's expertise, and the underlying scientific theo-

ries allow our evaluation of the helpfulness of the proposed testimony. We have concluded that the expert testimony and the studies would have been helpful to the jury in this case.

A remand for a similar assessment by the trial court would be pointless. We are constrained to reverse the conviction and remand for a new trial.

RINGOLD, A.C.J., and PEKELIS, J., concur.