[No. 18110-6-I.   Division One.   February 1, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. ANTHONY WILLIAM TAYLOR, *Appellant.*

*Edward E. Gibson,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Linda Jacke, Deputy,* for respondent.

MUNSON, J.—Anthony W. Taylor appeals his convictions for first degree burglary and first degree assault, contending the trial court erred in (1) admitting evidence of a pretrial photographic identification by the victim and (2) excluding the proposed testimony of his expert witness as to factors affecting the reliability of eyewitness identification. We reverse and remand for a new trial.

Facts pertinent to this appeal are as follows: Late in the evening of June 4, 1985, Frank Price, a 79–year–old widower, was awakened by a noise and his dog's barking. He got up, looked around the house, and went back to bed. When he was reawakened by his dog's growling, he got up, turned on the light above his bed, went to the foot of the bed, and was confronted by a man pointing a gun at him. Mr. Price was standing 6 to 8 feet away from the man. He could not see the man's face because he was holding the gun directly in front of his face. The man fired the gun twice, but it misfired. He then asked Mr. Price where he kept his money; he told him it was in the lower drawer in

the front bedroom. The man turned away and said something to another person, but kept the gun pointed at Mr. Price. He then walked over to Mr. Price and shot him between the eyes. Mr. Price was looking down when he was shot; the bullet lodged in his neck. Later, $680 was found missing from the front bedroom.

Mr. Price was able to crawl to his next–door neighbor's for help at approximately 11:30 p.m. The neighbors called 911; the police and an aid car arrived shortly thereafter. Mr. Price described his assailant to a police officer as a white male, 35 years of age, 5 feet 8 inches tall, and with long hair. He told the officer he did not know the assailant.

Detective Glen Gilbert compiled 29 arrest photographs to show Mr. Price. Although he usually uses only 6 photos, he chose 29 because he had no idea of the intruder's identity and was seeking identification factors. He did not contemplate that "the suspect" was within those photographs. He admitted in all probability none of those pictured was 35 and they were probably considerably younger. Two of the photos were of Mr. Taylor; one other man also appeared twice. The detective included Mr. Taylor's photos because he was told by another detective, who had had contact with Mr. Taylor, that he was a good suspect. One of the photos of Mr. Taylor was taken in 1981 and the other about a week before this incident.

Detective Gilbert visited Mr. Price in the hospital on June 7. He testified Mr. Price's face and nose were swollen, one eye was completely shut, the other eye barely open, he had an I.V. in his arm, a mask on his face, and his speech was slow and garbled. The hospital listed his condition as critical. Mr. Price carefully looked at the photographs and set four aside. He studied the four he had set aside and picked Mr. Taylor's photo, taken a week before this incident, and commented, "that's him, but I don't remember the mustache." Mr. Taylor was arrested later that day.

In an effort to confirm this identification and to satisfy himself of Mr. Price's selection, Detective Gilbert returned to the hospital 3 days later and again showed Mr. Price the

same 29 photographs. The detective testified Mr. Price was feeling better, the swelling had gone down, and both eyes were open. Also at that time, the detective took a taped statement from Mr. Price advising him that he had been here the previous Friday and showed him the photographs; in response to the detective's question as to how many of the photographs he had originally removed from the "stack," Mr. Price replied six. After the detective told him he had selected only four, Mr. Price identified Mr. Taylor's photograph, but again stated he could not recall the mustache. Detective Gilbert testified Mr. Price was certain he had correctly identified his assailant.

At trial, Mr. Price testified that the shooting had affected his eyesight, his senses of smell and taste, and left one side of his face paralyzed. He also had double vision in his left eye. He remembered having been shown the photographs one time, not two, and stated he was "fairly sure" he had chosen the photo of the man who had shot him. The prosecutor brought Mr. Taylor forward to stand in front of Mr. Price. When asked if this was the man who had shot him, Mr. Price replied: "His eyes look a little like the man who shot me, but I don't know if he had a mustache. It looks a lot like him. I'm not positive this is the man." When asked how sure he was, Mr. Price said "80 percent."

There is other testimony that Mr. Taylor worked at several fast food restaurants sometimes frequented by Mr. Price; that Mr. Price lived within a few blocks of Mr. Taylor's residence; that experts were unable to identify any screwdriver marks on Mr. Price's window with the screwdrivers found in Mr. Taylor's possession and did not find any paint chips or other materials from Mr. Price's house on Mr. Taylor's clothing. The police had found some cigarette butts on Mr. Price's lawn which were of the same generic brand as a cigarette package found in Mr. Taylor's car. However, there was no evidence of a saliva test or any other type of test that would connect the cigarette butts from Mr. Price's curtilage to Mr. Taylor.

Mr. Taylor's defense largely consisted of an alibi, supported by his wife and her mother, that he had been home on the night of the shooting. There is also testimony Mr. Taylor had gone to a service station where he worked to investigate a robbery. There was some confusion as to whether this occurred on June 3 or June 4. However, it must be conceded the crux of the case is the identification of Mr. Taylor by Mr. Price.

■ Mr. Taylor first contends the trial court erred in admitting evidence of the pretrial photographic identification by Mr. Price. Such a procedure may violate due process if the procedure, under the totality of circumstances, is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Hilliard,* 89 Wn.2d 430, 438, 573 P.2d 22 (1977) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968)). Although the findings of the trial court are of great significance, this court must independently evaluate the evidence. *State v. Rogers,* 44 Wn. App. 510, 515, 722 P.2d 1349 (1986). Reliability is the linchpin in determining the admissibility of pretrial identifications. *Manson v. Brathwaite,* 432 U.S. 98, 114, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977); *State v. Hanson,* 46 Wn. App. 656, 664, 731 P.2d 1140 (1987). We must first determine whether the procedure was impermissibly suggestive; if so found, then we must review the totality of the circumstances to determine whether that suggestiveness created a substantial likelihood of irreparable misidentification. *State v. Traweek,* 43 Wn. App. 99, 103, 715 P.2d 1148, *review denied,* 106 Wn.2d 1007 (1986); *State v. McDonald,* 40 Wn. App. 743, 746, 700 P.2d 327 (1985).

We do not find the photographic procedure to have been impermissibly suggestive. First, although the photographs displayed probably did not match the initial description given by Mr. Price, the purpose of the display was not to identify a suspect, but was an effort to compare facial characteristics and perhaps obtain a composite description that would ultimately identify the assailant. Thus, the number

29 was arbitrarily selected, compared to the usual 6 used in a photographic montage. The persons pictured, though all Caucasians, had varying facial features and lengths of hair; some had facial hair, others did not. There was nothing to distinguish this defendant's photograph from any of the others. Although they all contained the date they were taken (the dates were covered when the photographs were introduced as exhibits at trial), that does not cause the display to be impermissibly suggestive.

Given the light color of Mr. Taylor's mustache, it is understandable why Mr. Price might not have observed it while confronting an intruder pointing a gun at him in his bedroom shortly after 11 p.m. While there is a difference in the age description given and Mr. Taylor's true age, we find nothing unusual about that. Last, although Mr. Price claimed his assailant had long hair, a 79–year–old may have his own interpretation of what is long hair and what is not.

Second, the fact that two of the photographs included in the stack were of Mr. Taylor is not significant. The two photographs were taken 4 years apart and Mr. Taylor's appearance had changed considerably. Furthermore, the fact that these were 2 of 29, not 2 of 4 or 6, reduces the chance that the repetition is suggestive. Thus, under these circumstances, the fact Mr. Taylor was pictured twice would not make Mr. Price more likely to choose him.

Third, the fact the second identification involved the same 29 photographs, in and of itself, is not impermissibly suggestive. Although we recognize that recurrent photographic identification procedures may be suggestive in that they increase the risk of misidentification,[1] that is not always true. Considering Mr. Price's poor condition the first time the photos were shown to him and the fact the officers had very little other than Mr. Price's identification, it was

---

[1]*See, e.g., State v. Boucino,* __ Conn. __, 506 A.2d 125, 133 (1986); *People v. Kubat,* 94 Ill. 2d 437, 447 N.E.2d 247, 262 (1983); *State v. Dillard,* 355 N.W.2d 167, 174 (Minn. Ct. App. 1984); *State v. Maher,* 72 Or. App. 543, 696 P.2d 573, 575 (1985).

reasonable for the detective to attempt to verify the identification when Mr. Price's condition improved. Furthermore, Mr. Price only remembers one visit by Detective Gilbert. Under these circumstances, we do not find the second visit to have been impermissibly suggestive. Having so found, we need not determine whether it created a substantial likelihood of irreparable misidentification. We find no error.

Mr. Taylor next contends the trial court erred in excluding the proposed testimony of Dr. Geoffrey Loftus, a psychologist, as to factors affecting the reliability of eyewitness testimony. His offer of proof indicated Dr. Loftus would testify as to the effects of stress (including violence and fear), age, and weapon focus on human memory and perception. Also, he would explain the doctrine of unconscious transference whereby a witness may recognize a person because he saw him elsewhere around the time of the crime and now mistakenly identifies that person as having committed the crime. There was nothing in the offer of proof relating to Mr. Price's individual characteristics since Dr. Loftus neither had interviewed Mr. Price nor was overly cognizant of the facts of this crime.

ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

First, the admissibility of expert testimony is always within the sound discretion of the trial court and its admissibility or denial will be reversed only on an abuse of that discretion. *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.*, 106 Wn.2d 391, 397, 722 P.2d 787 (1986). "'If the reasons for admitting or excluding the opinion evidence are "fairly debatable", the trial court's exercise of discretion will not be reversed on appeal.'" *Group Health,* at 398 (quoting *Walker v. Bangs,* 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)).

For this testimony to be admissible under ER 702, (1) the witness must qualify as an expert, (2) the opinion must be based upon an explanatory theory generally accepted in the scientific community, and (3) the testimony must be helpful to the trier of fact. Here, the State does not challenge factors (1) and (2).[2] It did challenge factor (3) and the trial court excluded Dr. Loftus' testimony finding it would not assist the jury because the weaknesses in the witness' identification could be brought out in cross examination. This view of expert testimony on the unreliability of eyewitness identification is in accord with the view of the Ninth Circuit. *See United States v. Langford,* 802 F.2d 1176, 1179–80 (9th Cir. 1986); *United States v. Poole,* 794 F.2d 462, 468 (9th Cir. 1986); *United States v. Brewer,* 783 F.2d 841, 843 (9th Cir. 1986).

▇▇ Recently, however, this court in *State v. Moon,* 45 Wn. App. 692, 697, 726 P.2d 1263 (1986) recognized a growing trend in other jurisdictions that the exclusion of such testimony is an abuse of discretion in a very narrow range of cases: "(1) where the identification of the defendant is the principle issue at trial; (2) the defendant presents an alibi defense; and (3) there is little or no other evidence linking the defendant to the crime." *See United States v. Moore,* 786 F.2d 1308 (5th Cir. 1986); *United States v. Downing,* 753 F.2d 1224 (3d Cir. 1985); *United States v. Smith,* 736 F.2d 1103 (6th Cir. 1984); *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. Brown,* 40 Cal. 3d 512, 726 P.2d 516, 230 Cal. Rptr. 834 (1985); *People v. McDonald,* 37 Cal. 3d 351, 690 P.2d 709, 208 Cal. Rptr. 236 (1984); *Bloodsworth v. State,* 307 Md. 164, 512 A.2d 1056

---

[2]Neither party raises the applicability of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), although the standard for determining the admissibility of scientific evidence has been adopted in Washington. *See State v. Martin,* 101 Wn.2d 713, 719, 684 P.2d 651 (1984) (hypnotically aided testimony); *State v. Canaday,* 90 Wn.2d 808, 812–13, 585 P.2d 1185 (1978) (retesting of Breathalyzer ampules); *State v. Woo,* 84 Wn.2d 472, 473, 527 P.2d 271 (1974) (polygraph examination). The applicability of *Frye* is discussed in some of the cases cited in this opinion, but because that standard is not raised here, we need not discuss it.

(1986); *People v. Brooks,* 128 Misc. 2d 608, 490 N.Y.S.2d 692 (1985); *State v. Buell,* 22 Ohio St. 3d 124, 489 N.E.2d 795 (1986); *see also State v. Hanson,* 46 Wn. App. 656, 671, 731 P.2d 1140 (1987). The exhaustive analysis provided by the above cases persuades us that expert testimony on the unreliability of eyewitness identification can provide significant assistance to the jury beyond that obtained through cross examination and common sense. *See United States v. Langford, supra* at 1181–84 (Ferguson, J., dissenting). We stress, however, that to find the trial court abused its discretion in excluding such testimony, the three elements of *Moon* must be satisfied. We find they are met here.

First, there is no dispute the identification of Mr. Taylor as Mr. Price's assailant was the principle issue at trial. Second, Mr. Taylor presented an alibi defense supported by his wife and his mother–in–law. Third, as explained previously, there was little other evidence linking Mr. Taylor to the shooting of Mr. Price. The difference in the description given by Mr. Price and Mr. Taylor's actual appearance—his degree of certainty in his identification and the fact that most of this time the weapon was in his face—further supports our conclusion the testimony of Dr. Loftus was critical to Mr. Taylor's case. *See Moon,* at 698–99. Mr. Price's identification of Mr. Taylor, who lived in the same neighborhood as Mr. Price, may be plausibly explained by the doctrine of unconscious transference.

*State v. Johnson,* 49 Wn. App. 432, 439, 743 P.2d 290 (1987) has added one criterion to *Moon,* namely, "they will involve fact patterns which are close and confusing, and which 'cry out' for an explanation". (Footnotes omitted.) In those instances, expert testimony may be of assistance to the jury. While in *Johnson,* the court had exercised its discretion in allowing some of this testimony and excluding other, here, the court excluded all of Dr. Loftus' testimony. Further, in *Johnson* there were four separate victims of four separate crimes, each of whom identified the defendant. We find, on this record, that the testimony regarding

stress and weapon focus may have been of assistance to the jury.

Recognizing that neither *Moon* nor *Johnson* had been decided when this case was tried, we are constrained to find an abuse of discretion in not allowing Dr. Loftus' testimony.

We reverse and remand for new trial.

WEBSTER, J., concurs.

PEKELIS, J.—I dissent. The trial court's exclusion of the expert testimony on eyewitness identification was proper, and I would affirm.

The offer of proof by Dr. Geoffrey Loftus was, for the most part, an extremely general discourse on memory. Specifically, Dr. Loftus only opined in conclusory fashion that (1) stress can impair mental functioning, (2) older individuals are substantially less able to carry out any task involving cognitive abilities, (3) the term "weapon focus" means that one will "tend to pay attention to the weapon at the expense of other objects . . . such as the face," and (4) "unconscious transference" refers to a phenomenon in which "you remember—you recognize information, let's say a face that you have seen before . . . but you place it at the wrong place in time."[3]

The trial court noted that the testimony

doesn't add anything to what has already happened here. I might feel differently if he had more information about this particular case, if he had in fact talked to the victim . . . because the issue isn't so much whether or not what he had to say is true but whether or not the concerns of memory would apply to this case.

The court concluded that the testimony would not assist the trier of fact.

---

[3]Dr. Loftus also discussed a number of other influences on memory, such as the use of drugs, the effect of amnesia, and the effect of bias in questions or tests, none of which bore any apparent connection to the facts in this case.

As we said in *State v. Johnson*, 49 Wn. App. 432, 743 P.2d 290 (1987), where, as here, the trial court's express reason for excluding the proffered testimony was that it would not be helpful to the trier of fact, we will, in the great majority of cases, find this a proper exercise of discretion. *Johnson*, 49 Wn. App. at 439 (citing *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208, 1220 (1983)). To determine whether the case falls outside "the great majority,' the appellate court must do more than mechanistically apply the three numbered criteria in *State v. Moon*, 45 Wn. App. 692, 697, 726 P.2d 1263 (1986). As we explained in *Johnson*, exclusion of proper eyewitness testimony will be error when the three *Moon* factors are present *and* the case is a close and confusing one which cries out for an explanation which the proffered testimony would provide. *Moon*, 45 Wn. App. at 698. In other words, there must be serious factual discrepancies and a proper "fit" between those discrepancies and the expert testimony. In *Moon*, for example, the witness' initial description of the suspect did not match the defendant at all. Expert testimony on "post event" information purported to explain this discrepancy. *Moon*, at 699.

Turning to the case before us, I see no serious discrepancies requiring explanation. The victim described his assailant as about 35 years old and 5 feet 9 inches to 5 feet 10 inches. Taylor is 24 years old and 5 feet 8 inches. The physical differences between a man in his mid–twenties and mid–thirties are frequently subtle, and may seem particularly so to a 79–year–old. This is hardly the sort of "discrepancy" which requires expert explanation.[4] Furthermore, Dr. Loftus did not address any particular phenomenon of memory that would help to explain this discrepancy.

---

[4]The confusion over the mustache is not a "discrepancy" of the sort discussed in *Moon*. Here, it was the victim himself who spontaneously noted, while making his initial identification of Taylor, that he didn't remember the mustache. Thus, no unconscious forces appeared to be at work which required explanation.

The distinctive feature of this case is simply the victim's lack of certainty in his identification of Taylor. When asked at trial if the defendant Taylor was his assailant, he stated, "His eyes look a little like the man who shot me, but I don't know if he had a mustache." His other testimony on identification consisted of, "[i]t looks a lot like him" and "I'm not positive this is the man." When asked "how positive," he replied, "80 percent". In addition, the victim conceded that it was difficult to see the person during the robbery because when the two were face to face, the assailant's face was obscured by the gun he pointed at the victim's face obscuring his own face.

While this may be a weak case, it is not confusing. Furthermore, Dr. Loftus' proffered testimony would still have to be of assistance to the trier of fact in order to compel the admission of the expert testimony. Here, the jury could easily conclude that being robbed and shot in one's own bedroom is a stressful event which could affect memory. Likewise, the prominence of the weapon was acknowledged by the victim's own testimony, making any further testimony on "weapon–focus" superfluous. The victim's physical impairments, advanced age, and the generally tentative nature of his testimony also established in themselves the possibility[5] that he had problems with "cognitive functioning."

Finally, there was an insufficient factual foundation for admission of testimony on the doctrine of "unconscious transfer." Defense counsel elicited from the victim only the fact that he had, at some unspecified time, gone to Denny's, Wendy's, and Chicago Red Hots in the Lake City area. The record is totally silent on how often, when, and which ones. The defendant then testified only that he had, at one time

---

[5]Dr. Loftus' testimony would have added little more, since Dr. Loftus had never interviewed the victim or obtained any specific information about his cognitive functioning. Thus, nothing connected these generalities about older persons with the particular person in this case.

or another, been employed in each of those places.[6] Again, there was no reference to where, when, or for how long. This evidence is not sufficient to demonstrate a significant probability that the two had *ever* seen each other before. Thus, the exclusion of expert testimony on the subject was proper.

In summary, this case does not fall within the narrow range of cases where exclusion of the testimony was error. I would affirm.

---

[6]The record is replete with evidence that Taylor's work record was one of employment for very brief periods.