[No. 25611-4-I.    Division One.    August 26, 1991.]

MAX L. WELLS TRUST, *by* MARY ANN WELLS HORNING,
*Trustee, Respondent,* v. GRAND CENTRAL SAUNA
AND HOT TUB COMPANY OF SEATTLE,
ET AL, *Appellants.*

594

*James C. Fowler* and *David W. Gossard,* for appellants.

*Jane R. Koler* and *David G. Shenton,* for respondent.

GROSSE, C.J. — Grand Central Sauna and Hot Tub Company of Seattle and David Stadtner, Arthur Bruschera, Harold Lipset, and Arthur Norack (Grand

Central), appeal the money judgment entered in favor of the Max L. Wells Trust.[1]

Grand Central was a tenant in a building owned by Max and Margaret Wells. The lease was negotiated by Max Wells and signed by him and his wife. Max Wells died during the term of the lease. Upon Mr. Wells' death, the property became part of the corpus of the Max L. Wells Trust (Trust). Eight years into the 10-year lease, business at Grand Central diminished considerably and other costs of operation increased. The partners decided to shut down the business before the term of the lease expired. Thereafter Grand Central abandoned the property. Mary Ann Wells Horning, as trustee of the Trust, was the landlord at the time of the breach of the lease.

There is no dispute that Grand Central abandoned the premises after 8 years. The dispute arises over the interpretation of paragraphs 7.4(a) and (c), paragraph 7.2, and paragraph 14 of the lease. These paragraphs pertain to the rights and duties of the parties as to alterations and improvements made on the premises, and the rights of the parties on default and the remedies which follow.

First, paragraphs 7.4(a) and (c) set forth the rights of the parties with respect to alterations and improvements to the property. The first sentence of paragraph 7.4(a) stated that Grand Central could not alter or improve the building without the landlord's consent. Specifically the language in the lease was:

> Tenant shall not, without Landlord's prior written consent, make any alterations, improvements, or additions, in, on or about the Premises, except for non-structural alterations not exceeding $1,000 in cost.

---

[1]Grand Central was a California limited partnership doing business in Washington and the tenant in this landlord/tenant dispute. Its partners were made up of David Stadtner, managing partner, with Arthur Bruschera, Harold Lipset, and Arthur Norack as general partners. Defendants Rose Stadtner and Carmen Bruschera were married to David Stadtner and Arthur Bruschera respectively. There is no allegation or evidence in the record that either of these women were partners or signed the lease.

The second sentence of paragraph 7.4(a) states:

> *As a condition to giving such consent*, Landlord *may* require that Tenant remove any such alterations, improvements, additions or utility installations at the expiration of the term, and to restore the Premises to their prior condition.

(Italics ours.) A review of the record indicates that Max Wells gave his consent to the additions of the saunas, hot tubs, and the structural changes. No evidence was offered that, *at the time consent was given*, Mr. Wells required the premises be restored at the end of the lease or upon sooner termination.

Paragraph 7.4(c) states:

> *Unless* Landlord requires their removal, as set forth in Article 7.4(a), all alterations, improvements or additions which may be made on the Premises, shall become the property of Landlord and remain upon and be surrendered with the Premises at the expiration of the term. Notwithstanding the provisions of this Article 7.4(c), Tenant's machinery, equipment and other trade fixtures other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises, shall remain the property of Tenant and may be removed by Tenant subject to the provisions of Article 7.2.

(Italics ours.)

Paragraph 7.2 requires that the tenant surrender the premises "broom clean, ordinary wear and tear excepted." The same paragraph reveals that the tenant had a duty to repair the premises if there was damage occasioned by its use, or other damage caused by the removal of trade fixtures under paragraph 7.4(c). There was no evidence that Grand Central left the premises damaged. The trial court found that paragraphs 7.2 and 7.4 required Grand Central to restore the premises to its original condition.

Paragraph 14 of the lease is the defaults and remedies section. Paragraph 14.2 (Remedies in Default) provides the landlord may *either*: (1) terminate the tenant's right to possession and recover damages, the costs of reletting including necessary renovation and alteration of the premises; *or* (2) the landlord may maintain the tenant's

right to possession and collect the rent as well as enforce any other rights under the lease, but not both.

In September 1986, after 8 years of a good landlord/tenant relationship, Grand Central abandoned its tenancy, closed its doors, and stopped making rental payments.[2] In November and December of the same year negotiations were conducted trying to settle any dispute. No agreement was ever reached and the Trust filed suit.[3]

Initially Grand Central's position in negotiations was that it had a duty to restore the premises.[4] Through counsel it attempted to settle any liability by offering to restore the premises to the original condition of the building, and further pay miscellaneous bills that were due. As stated above, settlement, although close at times, was never attained.[5] Grand Central deposited two $15,000 installments into a joint, dual signature account with the Trust in order to pay for the costs of renovation. Eventually the Trust disagreed with the quality and progress of the restoration work and stopped any further performance by Grand Central or its agents. The Trust undertook to have the job completed itself. Although the

---

[2]The reasons given for the abandonment of the tenancy were that there was a significant drop in business due to a perceived health crisis, and that Grand Central could not economically obtain the required insurance on the premises and for its business.

[3]At trial Grand Central argued its belief that a settlement agreement had been reached between the parties. After the Trust filed suit, Grand Central continued to act as if settlement was probable and possible. The premise of an agreement had been reached but details concerning completion deadline, price, and other terms were never settled. As found by the trial court, however, no agreement was ever fully implemented or signed, and thus not binding.

[4]Its later position was that the landlord was bound by the terms of the lease, thus requiring the Trust to choose between remedies as set out in paragraph 14 of the lease.

[5]Grand Central believed the bids received by the Trust to restore the premises were too high. It attempted to review the initial bids received by the Trust, and also received other bids for the restoration work. Although Grand Central did not agree to all of the Trust's additional demands, it acted under an assumption that the conflict could be settled.

$30,000 fund was not fully depleted,[6] the Trust spent an additional $21,576.98 of its own funds to complete restoration of the premises.

In December of 1986 the Trust entered into a 6-month listing agreement on the property. It entered into a second listing agreement in early November of 1987. There was no listing agreement for the 4 months from June 30, 1987, through November 4, 1987. The evidence at trial about this time gap was that the listing agreement slipped everyone's mind until it was re-signed. Grand Central attempted to introduce evidence from Mr. Olson, an experienced commercial real estate broker in the downtown Seattle area, regarding the efforts the Trust made in reletting the premises. His opinion was that the actions of the Trust and its broker fell below the standard efforts necessary to relet the property. Further, he opined that the 4-month gap between listing agreements also evidenced that the Trust was failing to properly mitigate its damages. On the other hand, the trustee indicated her belief that it was not possible to rent the premises at the time because of the renovations going on. She also testified over defense counsel's objection that she felt the agent was working on reletting the property even during the time there was no formal listing agreement. The objection to the trustee's testimony was based on a lack of foundation or speculation as counsel contends she was testifying as to what she thought the agent was doing during this time but had no actual knowledge of what the agent was doing. The trial court overruled the defense's objection.

In January of 1988, the trustee terminated the existing listing agreement because the Trust was about to enter into a possible/potential sales agreement for the building. A final sale never occurred. There was an indication the Trust received remuneration from the potential buyer

---

[6]Approximately $5,720.94 was not spent from the joint fund. The whereabouts of this remaining amount is not disclosed in the record or the briefs of the parties.

during the time it was making a feasibility study on the building. This was not brought out in any further testimony.

After the parties' attempts to settle failed, a trial ensued. The trial court found Grand Central abandoned the premises and breached the lease with the Trust by (1) failing to pay the rents due, (2) failing to restore the premises, and (3) failing to pay other obligations (taxes and utilities) under the lease. The trial court held the Trust treated the term of the lease as subsisting and sued for the installments of rent and other items under the lease including the restoration of the premises. The court held the Trust did not treat the lease as terminated by the tenant's breach; it did not reenter and sue for damages. Further, the court held the Trust was required to mitigate its damages by attempting to relet, but that it made a good faith effort to do so. The court also found each of the named defendants, including the wives, jointly and severally liable for the judgment. The court entered judgment in the amount of $143,632.07 plus attorney fees of $25,000. From this judgment Grand Central appeals.

DISCUSSION OF THE CONTENTIONS IN THE CASE

A. Restoration.

Grand Central argues the lease did not require removal of improvements and alterations or for Grand Central to restore the premises. It claims the court erred in interpreting paragraphs 7.4(a) and (c) as requiring the restoration. Grand Central claims the language of paragraph 7.4 is unambiguous and that Max Wells, at the time of the negotiations, did not require restoration at the end of the term.

The Trust claims the language of the lease is ambiguous and this court could look to extrinsic evidence to interpret the contract. That evidence included testimony that at some time during the lease period the managing partner of Grand Central, David Stadtner, believed, whether mistakenly so or not, Grand Central

was required to restore the premises. Evidence of his belief was indicated by his letter to the City of Seattle in regards to the remodeling of the facia of the building. He also testified that at one time he believed Grand Central could be required to restore the premises and indicated he told this to his corporate counsel in California. In attempting to negotiate a settlement his counsel indicated Stadtner's belief was that Grand Central was obligated to restore the premises. However, Stadtner testified he did not read the written lease fully before signing, and that there were no negotiations about restoration of the premises. Based on these representations the trial court found that Grand Central had a duty to restore the premises.

■ The recent case of *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990) is instructive. In *Berg*, the Supreme Court rejected the theory that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible.[7] The challenge in *Berg* was whether a trial court committed error by failing to consider the entire circumstances under which a contract was made, as an aid in determining the parties' intent. However, the court said in *Berg v. Hudesman*, 115 Wn.2d at 667:

> We now hold that extrinsic evidence is admissible as to the entire circumstances under which the contract was *made*, as an aid in ascertaining the parties' *intent*. We adopt the Restatement (Second) of Contracts §§ 212, 214(c) (1981).

(Italics ours.) Thus the court has seemingly done away with the "plain meaning rule".[8]

---

[7]The court specifically overruled *St. Yves v. Mid State Bank*, 111 Wn.2d 374, 757 P.2d 1384 (1988) and other cases on this ground.

[8]"The Plain Meaning Rule states that if a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." (Footnote omitted.) J. Calamari & J. Perillo, *Contracts* § 3-10, at 166-67 (3d ed. 1987). In following this rule, the Washington Supreme Court has held that only if a contract is ambiguous on its face will the court look to evidence of the parties' intent as shown by the contract as a whole, its

As pointed out in *Berg*, the Supreme Court noted it has not consistently applied the plain meaning rule. Included in these cases is *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973) in which the court stated:

> Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

This framework for interpreting written contract language is called the "context rule". *See Eagle Ins. Co. v. Albright*, 3 Wn. App. 256, 474 P.2d 920, *review denied*, 78 Wn.2d 996 (1970).

All of this, however, has not changed the court's purpose in interpreting a contract. As recently held by this court in *Burgeson v. Columbia Producers, Inc.*, 60 Wn. App. 363, 366, 803 P.2d 838, *review denied*, 116 Wn.2d 1033 (1991), the *Berg* court sets out a new framework to aid in the analysis of contract issues.

> The court distinguishes between interpretation, a process in which the parties' intent is ascertained through the admission of extrinsic evidence, and construction, a process by which legal consequences are made to follow from the terms of the contract. The former analysis involves a question of fact; the latter, a question of law.

*Burgeson*, 60 Wn. App. at 366-67 (citing *Berg*, 115 Wn.2d at 663; 3 A. Corbin, *Contracts* § 534 (Supp. 1990)). Thus the court's duty is to ascertain the intent of the parties at the time the contract was made. As an aid in ascertaining the intent of the parties, a court may admit extrinsic evidence relating to the entire set of circumstances under which the contract was formed, including the subsequent conduct of the contracting parties.

---

subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their interpretations. *E.g.*, *St. Yves v. Mid State Bank*, 111 Wn.2d at 378.

■ However, the general rule is also that the parol (extrinsic) evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident or mistake, but is admissible to show the situation of the parties and the circumstances at the time of the execution of the written instrument for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence is not admitted for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. It is the duty of the court to declare the meaning of what is written, and not what was intended to be written. *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944), *cited with approval in Berg v. Hudesman*, 115 Wn.2d at 669.

■ Washington follows the objective theory of contracts, focusing on the objective manifestations of the agreement rather than the less precise subjective intent of the parties not otherwise manifested. Absent fraud, deceit or coercion, a voluntary signatory is bound to a signed contract *even if ignorant of its terms. Sherman v. Lunsford*, 44 Wn. App. 858, 861, 723 P.2d 1176 (1986). *See Lyall v. DeYoung*, 42 Wn. App. 252, 256-57, 711 P.2d 356 (1985), *review denied*, 105 Wn.2d 1009 (1986), and cases cited therein. Therefore, the parties are bound by the contract as signed and the parol evidence cannot change the contract, only aid in its interpretation.

A review of the lease agreement indicates the trial court made an improper determination or interpretation of the plain language of the document. The terms are clear.

First, the trial court's finding of fact 6, that paragraphs 7.2 and 7.4 of the lease specifically require Grand Central to restore the premises to its original condition, is in error. A reading of those paragraphs indicates that when consent is given for the alterations and additions and the landlord did not add any removal requirement of these

alterations and improvements at the time of consent, the permanent fixtures become the property of the landlord. Paragraphs 7.4(a) and (c).

The landlord's remedies for breach and/or abandonment are spelled out in paragraph 14.2. The landlord had an option at the time of default. The Trust could terminate the tenancy and recover damages under paragraph 14.2(a), or sue for the remainder of the term while keeping whatever improvements were made under 14.2(b). This is spelled out in the last sentence of paragraph 14.2(a) which states:

> In the event Tenant shall have abandoned the Premises, Landlord shall have the option of (i) retaking possession of the Premises and recovering from Tenant the amount specified in this Article 14.2(a), or (ii) proceeding under Article 14.2(b).

The trial court held that the Trust treated the term of the lease as subsisting and sued for the installments of rent and other items under the lease *including* the restoration of the premises. The court held the Trust did not treat the lease as terminated by the tenant's breach; it did not reenter and sue for damages. As shown by the previous discussion, this holding is correct up to the point where the court allowed recovery for the restoration of the premises. The trial court's holding is in error because it enabled the Trust to recover under both paragraphs 14.2(a) and (b) and its holding did not heed the plain language of the document requiring the Trust to choose between the options.

B. The Wives' Individual Liability.

In addition to alleging the above error, Grand Central objected to the entry of the findings and conclusions and the judgment against the wives of the general partners individually. Grand Central agreed that any judgment could be rendered against the general partners and their marital communities, but argues the judgment should not be entered individually against the wives.

■ As stated in Cross, *The Community Property Law in Washington (Revised 1985)*, 61 Wash. L. Rev. 14, 122 (1986):

A spouse's act creating both community liability and separate liability in the acting spouse ordinarily does not create separate liability in the nonacting spouse who has not participated in the transaction, that is, it ordinarily does not create three-way liability.

(Footnote omitted.) *See* RCW 26.16.010-.030. The majority of cases argued recently in the courts contain questions as to whether there is separate liability of one spouse or whether the community property can be attached. The presumption is that an obligation incurred or an enterprise undertaken by either spouse during marriage is for the benefit of the community. *Brubaker v. Hovde*, 45 Wn. App. 44, 47, 723 P.2d 1193 (1986). This fact is not disputed by Grand Central or the partners. Here, over the strenuous objection of Grand Central and its partners, the court entered judgment against the spouses of two of the partners, individually. There was no pleading that these women were partners themselves, nor that they signed the lease as a partner. There was no evidence entered at trial to create individual liability in either of these women. The lease was signed only by David Stadtner as the managing partner. The trial court erred in entering individual judgments against the spouses of partners Stadtner and Bruschera.

C. Mitigation.

Additionally, Grand Central contends the Trust failed to reasonably attempt to mitigate its damages during the period between Grand Central's breach and the expiration date of the lease period. Specifically, Grand Central argued there was a 4-month period during which no efforts or at least no listing agreement was in place for the building. The Trust counters that the building was not in a commercially reasonable shape to be relet until the restoration was complete. Grand Central argues that the effort made to secure potential tenants was not up

to commercially reasonable standards. The trial court rejected Grand Central's offer of proof (expert from a commercial real estate firm) as to what was commercially reasonable.

■ Generally a nonbreaching party must use reasonable means to minimize its damages. However it is the breaching party who has the burden of showing that reasonable alternative courses of action were open to the nonbreaching party. *Smith v. King*, 106 Wn.2d 443, 450-51, 722 P.2d 796 (1986); *Young v. Whidbey Island Bd. of Realtors*, 96 Wn.2d 729, 732-34, 638 P.2d 1235 (1982); *Maryhill Museum of Fine Arts v. Emil's Concrete Constr. Co.*, 50 Wn. App. 895, 901, 751 P.2d 866, *review denied*, 111 Wn.2d 1009 (1988). The trial court precluded Grand Central from doing so by rejecting its offer of proof. The testimony and evidence that was allowed regarding mitigation was sparse at best. Initially the Trust did attempt to mitigate its damages by giving an exclusive listing to a commercial real estate firm. However, as argued by Grand Central, the listing agreement expired 6 months later and was not renewed until 4 months after that. The trial court determined this was reasonable. As mentioned above, the trial court rejected Grand Central's offer of proof in which it attempted to show that the Trust's efforts were not fully reasonable. The court gave no reason except to say, "We will treat it as an offer of proof and reject it."[9]

Grand Central contends the trial court rejected this offer of proof in error. ER 702 governs the admission of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

[9]Counsel for the Trust objected to the testimony of Mr. Olson, the real estate professional who testified/gave the offer of proof, as being a surprise witness and/or a surprise expert. However, the trial court did not reject the testimony/offer on any specific ground.

■ ■ The admissibility of expert testimony is within the discretion of the trial court and its admissibility or denial will be reversed only for an abuse of that discretion. *State v. Taylor*, 50 Wn. App. 481, 487, 749 P.2d 181 (1988) (citing *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.*, 106 Wn.2d 391, 397, 722 P.2d 787 (1986)); *State v. Moon*, 45 Wn. App. 692, 696, 726 P.2d 1263 (1986). If the reasons for admitting or excluding the evidence are "fairly debatable", this court will not reverse the discretionary ruling of the trial court. *See Group Health*, 106 Wn.2d at 398; *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979); *State v. Taylor*, 50 Wn. App. at 487. Here, the proffered testimony was by an expert in the commercial property market in downtown Seattle. There is no indication in the record that the trial court did not believe Mr. Olson to be an expert. The testimony was offered to prove that the Trust did not act in a commercially reasonable way. By rejecting the offer of proof the trial court denied Grand Central the opportunity to present its case on the issue of mitigation. The trial court exercised its discretion on untenable grounds. The offered testimony on the issue of mitigation should have been admitted.

The trial court also overruled an objection by Grand Central's counsel to the trustee's testimony regarding what the agent/broker *might* have been doing during the 4-month period in which there was no listing agreement. The testimony of the trustee was objected to by defense counsel as lacking foundation.

■ A review of the record indicates the court allowed the trustee's conjectural statements about the listing during the period in which there was no listing agreement in place. The objection was timely made and the court erred in allowing this testimony.

The trial court did not give any basis for rejecting Olson's testimony and improperly allowed the trustee's conjectural statements thus prejudicing Grand Central's case on mitigation. Because Grand Central was precluded

from presenting its case, the issue on mitigation must be remanded to the Superior Court for an additional hearing on this issue.

D. Attorney Fees.

█ Both parties have asked for attorney fees on appeal. As a result of our opinion, the judgment against Grand Central must be reduced on appeal. Therefore Grand Central is the prevailing party on appeal and fees should be awarded to it pursuant to the terms of the lease and RAP 18.1(a).

CONCLUSION

Although a judgment for the Trust on account of Grand Central's breach of the lease is correct, the trial court erred in determining that Grand Central was required to restore the premises after the breach as well as treating the lease as subsisting. The decision of the trial court as to the restoration is reversed and the case remanded for entry of a judgment which does not include the costs of restoration. The judgment after remand must grant a credit for Grand Central's moneys used in restoring the premises, release the individual judgments against the spouses of two of the partners, and take into consideration the results of the additional hearing regarding the Trust's attempt to mitigate its damages. The case is remanded to the trial court for actions consistent with this opinion.

FORREST and KENNEDY, JJ., concur.

Reconsideration denied November 25, 1991.

Review by Supreme Court pending May 1, 1992.