[No. 18568.    Department One.    July 31, 1924.]

PUGET SOUND TELEPHONE COMPANY, *Appellant*, v. THE TELECHRONOMETER COMPANY OF AMERICA, *Respondent*, GARRISON BABCOCK *et al.*, *Interveners and Respondents*.[1]

EVIDENCE (167)—PAROL EVIDENCE TO VARY WRITING—FRAUD. In an action on an account, in which fraud is alleged and each party charges the other with acts of bad faith in all the transactions, parol evidence to vary or alter the terms of a promissory note and other instruments involved is admissible.

APPEAL (416)—REVIEW—FINDINGS IN EQUITY. Where the trial court heard and saw the witnesses in an involved matter in dispute, and circumstances tended to corroborate his view, the findings will not be disturbed on appeal.

INTEREST (3)—COMPENSATION FOR USE OF MONEY—LOANS—ADVANCES. Advances made to finance a concern come within the denomination of loans, as used in Rem. Comp. Stat., § 7299, providing that all loans or forbearances of money shall bear interest at the rate of six per cent.

ACCOUNT—PROCEEDINGS AND RELIEF—JUDGMENT—CONDITIONAL DECREE. In an action for an accounting, where it would be inequitable to allow a judgment upon which patents and devices would be sold on execution, when the amount due was to be paid only from profits of the venture, if any, it is proper to award a conditional judgment giving two years' time to work out the matter, without prejudice to the right to apply to the court for a further review, in case of failure to apply the profits to the balance due.

[1]Reported in 227 Pac. 867.

CORPORATIONS (217)—APPOINTMENT OF RECEIVER—INSOLVENCY—
DISCRETION. The appointment of a receiver for an insolvent cor-
poration, under Rem. Comp. Stat., § 741, rests in the discretion of
the trial court, and the same will not be disturbed where the
rights of the parties are fully taken care of.

Cross-appeals from a judgment of the superior court
for King county, Mills, J., entered August 27, 1923, in
an action for an accounting. Modified as to interest
on plaintiff's appeal.

*Williams & Davis* and *Tanner & Garvin,* for appel-
lant.

*Caldwell & Evans,* for respondent and cross-appel-
lant.

*Raymond D. Ogden,* for intervener and cross-appel-
lant Garrison Babcock.

HOLCOMB, J.—This exceedingly complicated contro-
versy involves two suits. The first was against re-
spondent, the Telechronometer Company of America,
a corporation, on a promissory note in the ordinary
form. The complaint therein alleges the corporate
capacity of appellant and respondent; the execution
and delivery of a note for $72,500, setting forth a copy
thereof, a credit of $50,000 thereon, and demanded
payment of the balance, $22,500, with interest at eight
per cent, and an attorney's fee provided in the note of
ten per cent.

The second was by the same appellant against the
same respondent upon an open account, alleging a bal-
ance due thereon from respondent to appellant in the
sum of $71,447.68, which, it was alleged, appellant, at
the special instance and request of respondent, had
from time to time advanced to respondent for its use
and benefit, in setting up an arrangement for the in-
stallation and demonstration of telechronometer in-

struments at the Everett exchange of appellant, in carrying on its business and in payment of labor and for material, supplies and expenses, which it was agreed should be repaid. It is also alleged that respondent is insolvent, has no income, and cannot pay its indebtedness, and that its officers are conducting its business in an extravagant manner, paying exorbitant salaries, borrowing money for that purpose, and issuing notes of the company therefor. Judgment is prayed for the amount of the account, and the appointment of a receiver for respondent.

In this action, Garrison Babcock intervened, demanding damages in the sum of $500,000; or, in the alternative, the return to him of all stock held by appellant company in the defendant company, and for judgment against the appellant company in the sum of $100,000, and costs and disbursements; and that relief be denied appellant, and that no receiver be appointed at the suit of appellant.

The Telechronometer Company of Washington, a corporation, also intervened, demanding an accounting of appellant, and other relief.

In the action on the note, respondent, in its answer, after traversing certain allegations, set up five affirmative defenses:

(1)   That the note was executed by Garrison Babcock as vice-president of the corporation, without authority.

(2)   That Mr. Winter, president, and almost sole owner of appellant, and also one of the principal stockholders and officers of respondent, had caused the note to be issued for the purpose of deceiving the officers and stockholders and others interested in appellant, and in particular the Pacific Telephone & Telegraph Company, which was interested in the financing of ap-

pellant, and that the note was fictitious and never intended to be, and was not considered a binding obligation.

(3)  That, on June 17, 1921, Babcock paid to the appellant for respondent the sum of $20,000, which should have been credited upon the note.

(4)  That, in arriving at the amount of the note, there was included the sum of $40,000 of bonds of the plaintiff, which were redeemed by it for the sum of $28,593.34, and that respondent was entitled to a credit for the difference, $11,406.66, upon the note.

(5)  That respondent is entitled to a credit of $15,000 on account of the purchase of stock in respondent in addition to the $50,000 in stock credited by appellant.

The reply of appellant put in issue the affirmative allegations of respondent's answer.

The answer and cross-complaint of respondent in the suit upon the open account comprise forty-two pages, exclusive of exhibits. Advances in the sum of $58,269.31 by appellant to respondent are admitted; but against this, it is alleged that appellant purchased $65,000 worth of preferred stock of respondent, leaving a balance owing respondent of $6,730. Several affirmative matters are then set up by respondent which may be summarized as follows:

(1)  That the Pacific Telephone & Telegraph Company is the owner of a large amount of the bonds of appellant, and that Winter, as president and owner of appellant, had violated the provisions of a trust deed securing such bonds, in particular by his expenditures in connection with the telechronometer patents; that Winter had caused the $72,500 note and other obligations of appellant and Babcock to be issued for the purpose of deceiving the Pacific Telephone & Tele-

graph Company; and that, moreover, Winter was attempting to wreck the affairs and business of respondent at the instance of, and upon the demand of, the Pacific Telephone & Telegraph Company.

(2) That, after his disagreement with the other stockholders, Winter desired to control the Telechronometer Company of America in his own interest; and, failing in this, he set out upon his deliberate attempt to wreck the respondent corporation.

(3) That, at the time Winter and Babcock reacquired the interest of one Keeler in the telechronometer patents, it was agreed by Winter for appellant that appellant would finance respondent corporation "until a state wide order," of the then Public Service Commission of Washington was obtained, and that this agreement was breached by appellant to the damage of respondent in the sum of $500,000.

These allegations of the answer and cross-complaint, and the allegations of the complaints in intervention, were put in issue by replies and answers of appellant.

The two cases were consolidated for trial by stipulation, and the trial lasted some four weeks. A record of 1,427 pages of testimony, besides 220 exhibits, many of which are very voluminous, was produced.

The court disposed of the cases substantially as follows:

(1) It was found that appellant had advanced, over and above proper offsets and credits, the sum of $18,314 to respondent, but that appellant was only entitled to payment of this sum from the net profits of respondent's business, and from profits, if any, received from the sale of its stock, and "to the extent only as may be determined by the board of trustees of the defendant Telechronometer Company of America, in the exercise of the discretion of said board in deter-

mining what amounts, if any, may be paid upon said balance without interference with the orderly and proper conduct of the defendant company.'' Appellant was given the right, after two years, to apply to the court to review the action of the board of trustees in refusing to apply the profits or proceeds of the stock sales towards the payment of the balance due.

(2)   Interest on the balance was refused.

(3)   It was adjudged that the appellant had no lien upon the telechronometer patents.

(4)   The appointment of a receiver was refused.

(5)   The suit for a balance of $22,500 alleged to be due on the promissory note was dismissed with prejudice.

(6)   Respondent was awarded costs.

(7)   The cross-complaint of the Telechronometer Company of America was dismissed.

(8)   The complaint in intervention of Babcock and the Telechronometer Company of Washington were dismissed with prejudice.

From this judgment, appellant appeals; respondent filed a cross-appeal, and the intervener Babcock filed a cross-appeal.

The trial judge refused to make definite findings of fact; but, at the conclusion of the trial, and while the matters were fresh in his mind, pronounced a very logical and comprehensive opinion, which, when judgment was signed later, he supplemented somewhat.

The facts are so involved and complicated that not even an intelligent summary within the proper limits of an opinion, can be attempted here. Appellant relies principally for a reversal upon the proposition that the trial court permitted parol evidence to vary or alter the terms of the promissory note, and of a certain

other instrument involved in the transaction, known as the "Winter-Babcock Proposal."

A brief statement of the matter may be made as follows:

Babcock, one of the principal inventors and owners of certain patents in appliances for the purpose of measuring telephone conversations, the utility of which is conceded or not denied, had had difficulty in financing the same so that they could be properly demonstrated commercially. He had previously interested other persons and concerns in the patents, which were known as the "Beattie-Babcock Group" of patents. Winter was the owner of all of the capital stock, and president and general manager of the appellant. In 1919, Winter and Babcock undertook to acquire the telechronometer patents which were then owned by a company in Galion, Ohio. On December 4, 1919, an option for the purchase of the patents was obtained for $25,000. The option was taken in the name of Babcock. Winter agreed to advance $10,000 of the purchase price. Babcock undertook to obtain the remaining $15,000 from parties in Chicago, and it was agreed that the respective interests should be 50-50. The patents were procured from the Galion, Ohio, company, Winter paying $24,000 therefor, and the appellant company $1,000.

Winter and Babcock, desiring to demonstrate the practicability of the devices, conceived that such demonstration could best be made at the exchange of appellant in Everett. To that end, some meters were installed and placed in operation in February, 1920. An arrangement was made on June 17, 1921, with one Frank Keeler, whereby a fifty-one per cent interest in the Beattie-Babcock patents was sold to him by Babcock and Winter for $25,000 cash, and an agreement

that a corporation should be organized, and a note of $20,000 made to Winter. Keeler undertook to finance the corporation by the sale of its preferred stock. Pursuant to this agreement, the respondent company was incorporated June 24, 1921, capitalized at $3,000,-000 common stock, and $2,000,000 of preferred stock. After the purchase of the patents by Babcock and Winter, the expenditures in connection with the improvement and testing of the devices and demonstrating the practicability were advanced by appellant company, and the items charged to an account on the books of that company known as "Telechronometer Expenses" No. 803. The end towards which Winter and Babcock were working was an order of the then Washington public service commission prescribing measured rates for all telephone systems of the state, denominated by them as a "state wide order," thus requiring the telephone companies to install the telechronometers as the only practical means of rendering measured service.

They procured an order from the then Washington public service commission sanctioning the complete equipment of the Everett exchange with the telechronometers, some 5,400 being installed, and the Telechronometer Company of Washington had made a contract with the Kilbourne & Clark Manufacturing Company for the manufacture of the instruments.

In its various activities, it is shown that the appellant company had paid out, including the thousand dollars paid on the option to purchase the patents, $9,000, and Winter had paid out $27,000, including the $24,000 paid on the option. The receipt of the $20,000 payment by Winter from Keeler, and the payment of $5,000 to Kilbourne & Clark, reduced Winter's advances to approximately $12,000, while the appellant

company's advances remained at $9,000. Keeler failed to perform his undertaking to finance the company, and Winter and Babcock, being dissatisfied with his failure, desired to eliminate him from the company. An action was brought by Babcock against Keeler and his associates, including Winter and one Bristol, charging breach of the contract to finance the company. This suit was compromised by a stipulation of the parties dated September 21, 1921, under which Winter and Babcock assumed Keeler's obligations to respondent, including his unpaid subscriptions to the capital stock, agreed to pay him $15,000 in cash, and to deliver to him $40,000 of the bonds of appellant, with the option to re-purchase such bonds at 70%. Keeler in turn relinquished all interest in the corporation. This settlement was consummated, and the $15,000 in cash, and the $40,000 in bonds were furnished by appellant, and meanwhile appellant had paid an additional $7,500 to Kilbourne & Clark. Appellant therefore contends that the account then stood as follows:

```
Winter, approximately.............$27,000
   Less credit....................  15,000
                                   -------
       Balance ....................... $12,000
Puget Sound Telephone Co. miscel-
   laneous  f r o m  acquisition of
   patents  to  August  1,  1921,
   approximately ................$10,000
Kilbourne & Clark.................  7,500
Cash to Keeler....................  15,000
Bonds delivered to Keeler.........  40,000
                                   -------
       Total ......................... $72,500
```

On September 22, 1921, the day following the settlement with Keeler, Winter and Babcock made a formal written proposal to the respondent, which is called the "Winter-Babcock Proposal." Under the terms of this proposal, Winter and Babcock agreed to convey all

their beneficial interest in the patents, and to confirm the assignments theretofore made to, but unaccepted by respondent, in payment for its entire capital stock upon certain terms and conditions specified in the proposal, among which was the assumption of the obligation of $72,500 to appellant to be evidenced by a 90-day promissory note. The common stock of respondent, 30,000 shares, was to be issued to persons designated in the proposal, as follows:

|  | SHARES |
|---|---|
| Puget Sound Telephone Company, 30% | 9,000 |
| W. N. Winter, 25% | 7,500 |
| Garrison Babcock, 25% | 7,500 |
| W. C. Bristol, 20% | 6,000 |

On September 24, 1921, separate meetings of the stockholders and trustees of respondent company were held, officers elected, and the conditions of the Winter-Babcock Proposal were in all things accepted in return for the patents, which were likewise accepted. The trustees thereupon authorized the president and secretary to carry out all things necessary to be done to complete the transaction on the part of the corporation. Winter, Babcock and Bristol then directed their attention towards financing the respondent company, Bristol acting as general counsel for respondent, and also for the appellant company. A. S. Taylor, of Everett, was employed by respondent in an executive capacity at a salary of $1,000 a month. He was elected vice-president, and began to draw that salary on November 1, 1921, and was still receiving it at the time of trial. He was given $300,000 in stock of the company, and agreed to sell sufficient of the preferred stock to take care of existing obligations and finance the company to such time as it was expected that a "state wide order" would be obtained. Taylor testified that he merely undertook to interest some of his

friends in the stock of the company. He did sell stock aggregating $44,000, from the first $25,000 of which no money was realized.

Kilbourne & Clark continued to manufacture instruments under its contract. The installation of the Everett exchange was completed and the devices put into service December 4, 1921. On March 20, 1922, the order of the department of public works of Washington was obtained establishing a schedule of measured rates for telephone service at Everett, effective April 1, 1922. Measured rates with modifications continued until October 1, 1922, when the flat rates formerly in effect were restored by order of the department of public works. (Respondent and Babcock contend that this order was made at the secret instigation of Winter.) Much opposition developed to the measured rates service, and it soon became apparent that a state wide order such as was desired was very improbable of attainment. Early in 1922, respondent having failed to obtain sufficient moneys from the sale of its preferred stock to carry on its undertaking, Winter, for appellant, announced that, after April 1, 1922, appellant would advance no further funds. Appellant did, however, afterwards advance some $7,500, but no advances were made after June 14, 1922.

It will be observed that the suit upon the note was resisted upon, among other grounds, the allegations that it was procured by overreaching and deception, and for an ulterior motive, on the part of Winter in behalf of appellant company, and that it never was intended to be a valid obligation of respondent. The suit upon the open account involved a long detailed accounting between appellant and respondent, including financial transactions between the promoters before the incorporation of respondent. Under all the

issues, the consolidated action was essentially an equity case, and apparently so considered by all parties.

The first action was simply an action for the balance due upon a promissory note. The second action was an action upon an open account and under the issues became a question of an accounting, and for a receiver. Neither of the actions was based upon the Winter-Babcock proposal. Since, therefore, neither of the parties was seeking to recover upon the Winter-Babcock proposal it is difficult to understand how the parol evidence rule applies to that instrument as contended by appellant. In any event, in the action on the account, the answer charges Winter with acts of bad faith and overreaching in all the transactions with Babcock and respondent company, and therefore parol evidence should be admitted as to the real transactions between the parties.

It is true, that we have repeatedly held that the parol evidence rule applies to negotiable instruments. *Post v. Tamm,* 91 Wash. 504, 158 Pac. 91; *Van Tassel v. McGrail,* 93 Wash. 380, 160 Pac. 1053; *Rhodes v. Owens,* 101 Wash. 324, 172 Pac. 241; *Moore v. Kildall,* 111 Wash. 504, 191 Pac. 394; *MacCallum-Donahoe Finance Co. v. Devoe,* 121 Wash. 295, 209 Pac. 514. And we held in *Anderson v. Mitchell,* 51 Wash. 265, 98 Pac. 751, that, "in the absence of fraud or mistake it was incompetent for one who signed a promissory note as principal to set up an independent collateral agreement limiting or exempting himself from liability. He is bound by the terms of his obligation."

But in this case, fraud was alleged. While the word "fraud" was not used in the pleadings of respondent and the interveners, acts of bad faith, deception and overreaching were alleged which amounted to fraud.

The trial court was very positively of the view that, on June 17, 1921, all the financial relations between Winter and Babcock up to that time were settled. He was positively of the view that the note did not represent the true relation between the parties at the time it was planned to be given, or at the time it was actually given; but that it included items that were contingent, as, for instance, the matter of the bonds, and included matters that had all been settled between the parties long prior to that time. He was therefore of the positive opinion that the note was "not a *bona fide* note." He saw and heard all the witnesses, and was able to judge of their credibility. Since Winter and his company, the appellant, together were the owners of 55 per cent of the stock of respondent company, and there are other incidental circumstances shown in the record which tend to corroborate the view of the trial court, we are inclined to hold with the trial court that the note was not a *bona fide* or valid note, and was subject to be avoided for fraud, although the trial court did not so denominate the situation.

From a careful consideration of the trial court's opinion and all the items involved in the complicated accounting, we are of the opinion, also, that the amount he allowed on the account, $18,315, is substantially correct,—probably as correct a result as we could have arrived at after months of study. We are of the opinion, however, that interest should have been allowed on the account at legal rate. The statute, Rem. Comp. Stat., § 7299 [P. C. § 3155], provides that all loans or forbearances of money shall bear interest at the rate of six per cent. We see no reason why interest should not be allowed on this account after it has become liquidated and balanced any more than it should not be allowed on any other loan or forbear-

ance of money. They were advances made by appellant, and therefore come within the statutory denomination of loans. Interest at the legal rate will therefore be ordered.

We have some difficulty in disposing of the conditional judgment granted by the trial court, and of the refusal to appoint a receiver. The trial court's reason for the conditional judgment, as stated, was that it would be inequitable to allow appellant to have judgment and execution for the same since the result would be that the telechronometer patents and devices would be sold at execution sale, and bidden in by appellant, thus accomplishing the very thing it set out to accomplish; that it was the fault of Winter that respondent had not been more successful than it had been, and that all the parties from the very inception of the matter realized that, in order for anybody to get anything out of the proposition, it must be made a marketable proposition. It was for the same reason that the court refused to appoint a receiver. The conditional judgment and the refusal to appoint a receiver, were, however, made without prejudice to the right of the appellant to apply for a receiver at any subsequent time in case of mismanagement, or the development of other matters justifying the appointment of a receiver.

Appellant insists that, since the trial court declared that respondent company was insolvent in every legal sense, not being able to pay demands against it in the ordinary course of business, the court was required to appoint a receiver under § 741, Rem. Comp. Stat. [P. C. § 8414]. It is urged that all our decisions so hold.

But it was held in *Beeler v. Standard Investment Co.*, 107 Wash. 442, 187 Pac. 896, 5 A. L. R. 363, that

the above cited section gives the trial court wide discretion in matters of that kind.

Under the broad equity power of the superior court, and under the equitable showing made in this case by respondent, and the interveners, we have become convinced that the conditional judgment and the denial of a receivership should not be disturbed.

We are satisfied that, in general, the rights of respondent and the interveners are fully taken care of under the facts in this case, so that the cross-appeal of respondent and the interveners are without merit.

The decree of the trial court is modified to the extent that it is ordered to allow interest on the balance of the account found to be due appellant, and in all other respects stand affirmed.

Appellant having recovered a more favorable judgment, is awarded costs of appeal.

MAIN, C. J., PARKER, TOLMAN, and BRIDGES, JJ., concur.