IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STADELMAN FRUIT, LLC, a Washington limited liability company, | ) ) ) | No. 35165-3-III |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| JIM D. VOORHIES, a single person, | ) ) | |
| Appellant, | ) ) | |
| JOHN E. HOWARD, as Personal Representative for the ESTATE OF FLORENCE E. HOWARD, | ) ) ) ) | |
| Defendant. | ) ) | |

FEARING, J. — Plaintiff Stadelman Fruit, LLC filed suit to collect on a debt owed

by defendant Jim Voorhies and to foreclose on a mortgage securing the debt. The trial

court granted Stadelman Fruit summary judgment and dismissed counterclaims asserted

by Jim Voorhies. We affirm.

## FACTS

Plaintiff Stadelman Fruit, LLC operates as a fruit packing facility that handles,

packs, markets, and sells fruit grown by Yakima Valley orchardists. As with other fruit

packing facilities, Stadelman Fruit enters agreements with orchardists, under which agreements an orchardist agrees to deliver the orchardist's entire crop for a year and the facility agrees to store, process, pack, market, and sell the fruit on behalf of the orchardist. Often the fruit packing facility advances growing and harvesting costs to the orchardist so that the orchardist need not procure a bank loan. Defendant Jim Voorhies has operated apple orchards in Yakima Valley since at least 1996.

Jim Voorhies first contracted with Stadelman Fruit to pack, store, and market Voorhies' apple crop in 1996. Stadelman Fruit then advanced money to Voorhies for operating expenses. After the sale of the 1996 crop, Voorhies owed a deficit of $100,000 to Stadelman Fruit. Stadelman Fruit did not then demand payment of $100,000, but instead insisted that Voorhies deliver three loads of apples to Stadelman Fruit in 1997. Voorhies did so.

Jim Voorhies next entered a fruit handling agreement with Stadelman Fruit in 1998. Stadelman Fruit loaned money to Voorhies that year. As in 1996, the proceeds from the 1998 crop did not offset the debt owed to Stadelman Fruit and the charges assessed by Stadelman Fruit for handling the crop. In a declaration, Jim Voorhies testified that Pete Stadelman, an owner of Stadelman Fruit, told him that he need not pay the debt. Pete Stadelman is deceased.

From 1999 to 2007, Jim Voorhies delivered his apple crops to other fruit handling facilities. Hopefully, he enjoyed a financial return in one or more of those

years.  An agent of Stadelman Fruit approached Jim Voorhies in early 2008 and Voorhies

agreed to market his 2008 crop through Stadelman Fruit in exchange for advances for

growing and harvest expenses from Stadelman Fruit.

On March 5, 2008, Jim Voorhies and Stadelman Fruit entered a fruit handling

agreement.  The agreement required Voorhies to deliver to Stadelman Fruit all

marketable apples grown in his orchards during the crop year.  In exchange, Stadelman

Fruit, in its sole discretion, handled all necessary processes for postharvest handling,

packing, market and sale.  Paragraph 1.2 of the agreement declared:

> <u>Basis of Handling and Marketing</u>: During the term of this
> Agreement, Grower [Jim Voorhies] hereby authorizes Handler [Stadelman
> Fruit] to handle and market Grower's fruit described in paragraph 2.1
> below in Handler's regular pool(s) as Handler, in its sole discretion,
> determines to be in Grower's best interest.

Clerk's Papers (CP) at 72.  The agreement imposed onerous terms on Jim Voorhies

regarding the wide discretion Stadelman Fruit reserved in handling and marketing

Voorhies' crop.  In addition to the language of paragraph 1.2, paragraph 1.4 of the fruit

handling agreement prescribed:

> <u>Handling and Marketing</u>: Handler shall handle and market Grower's
> fruit in accordance with the customs and standards of the industry and in
> accordance with Handler's standard practices, which Handler may, in its
> sole discretion, change from time to time, provided such changes shall
> apply to and treat all growers similarly situated with respect to quality,
> quantity and varieties of fruit alike.  Unless otherwise agreed in writing
> between Handler and Grower, Handler shall have the following rights,
> obligations and authority with respect to the handling and marketing of
> Grower's fruit:

3

   1.4.1 <u>Packing - Grade Standards</u>: Handler shall have the right and is authorized to determine the type of pack and packaging of Grower's fruit to establish standards for packs and types of packs, which standards may be greater than those established by state, federal or industry grades.  In addition, Handler reserves the right to establish quality and other reasonable standards for the purpose of determining which fruit, if any, may be placed in Handler's controlled-atmosphere storage facilities.

   1.4.2 <u>Marketing Decisions</u>: Handler is authorized to market all fruit subject to this Agreement at such times and prices, and in such quantities as the market will accept and as Handler, in its sole discretion, deems to be in the best interest of Grower.  All sales and marketing decisions, including extensions of credit, price adjustments, the use of handlers, dealers, brokers, dealers, or traders and the geographic location of purchasers, shall be made in the sole discretion of Handler.

CP at 72-73.

The fruit handling agreement signed in March 2008 applied to the 2008 crop year. Nevertheless, paragraph 3 of the agreement declared that it automatically renewed in subsequent crop years unless either party chose to terminate the agreement in writing. The agreement further extended its terms to include all crop years until Jim Voorhies paid all debt owed Stadelman Fruit:

   3. <u>TERM</u>: The term of this Agreement is for the 2008 crop year; provided, however, that this Agreement shall be considered as automatically renewed from year to year thereafter, unless either party terminates this Agreement by giving the other party written notice not later than March 1 of the crop year in which termination is desired.  In addition, the term of this Agreement shall automatically be extended and shall include all subsequent crop years and crops grown during such crop years until all obligations, including advances, owed by Grower to Handler under the terms of this Agreement have been paid in full unless otherwise determined by Handler.  In other words, it is contemplated that so long as Grower is indebted to Handler, Grower will continue to bring Grower's fruit to Handler for the purpose of handling and marketing in order to

4

accommodate Handler's economic interest as a handler and packer of Grower's fruit and for the purpose of protecting Handler's rights as a creditor of Grower. Termination shall be prospective only and shall not, unless otherwise agreed in writing, affect the rights, liabilities and obligations of the parties with respect to fruit which previously has been delivered by Grower to Handler for purpose of handling and marketing.

CP at 75.

The 2008 fruit handling agreement allowed Stadelman Fruit to provide advances or operating loans to Jim Voorhies, which loans Voorhies would secure with a mortgage. The parties anticipated use of the advances for growing expenses. Voorhies would not have marketed his apples through Stadelman Fruit without Stadelman Fruit's willingness to provide operating loans. The advances clause in the agreement read:

7. <u>ADVANCES</u>: Handler may make discretionary advances to Grower to grow and harvest Grower's fruit crop on such terms and conditions as Handler shall, in its sole discretion, determine to be appropriate. If Handler has agreed to make an advance to Grower, Grower hereby agrees to execute any security agreement, promissory note, financing statement, and other documents deemed reasonable and necessary by Handler to ensure the repayment of such advances and, in addition, any subordination agreements determined reasonable and necessary by Handler for such purpose. Handler's decision to make advances in any particular instance shall not constitute an obligation or agreement by Handler to provide such advances to Grower in the future, and Grower acknowledges and agrees that such advances are discretionary with Handler.

CP at 77.

The March 2008 fruit handling agreement allowed Stadelman Fruit to offset any advancements and any handling charges against the proceeds of the sale of fruit:

5

6.2 <u>Right of Offset</u>: The parties understand and agree that Handler shall have the right to offset all advances, assessments, charges and expenses owed by Grower prior to the payment of any funds to Grower or any third party having an interest in Grower's crops or proceeds thereof.

CP at 76. Voorhies also promised to execute any security documents Stadelman Fruit requested:

8.2 <u>Security Documents</u>: Grower shall, procure and deliver to Handler or execute for Handler, at its request, any additional security agreement, financing statement, negotiable warehouse receipt, promissory note for advance of credit given by Handler to Grower, or other writing necessary to create, preserve, protect or enforce Handler's lien and/or security interest in Grower's crops and its rights under state and federal law.

CP at 77. The fruit handling agreement provided for periodic accountings:

10. <u>PAYMENT AND ACCOUNTING</u>: Handler shall, upon written request by Grower, provide periodic accountings of all Grower's fruit sold to that date, less charges, advances and authorized deductions. Handler shall remit any balance due Grower within sixty (60) days after receipt of the proceeds from the sale of Grower's fruit and final accountings have been made and completed, provided, however, that Handler does not guarantee collection on fruit sold, placed, or consigned. In determining whether any balances are owed by Grower, charges, expenses and advances in connection with all fruit subject to this Agreement shall be taken into consideration. . . .

CP at 80.

In the event Jim Voorhies failed to deliver a crop to Stadelman Fruit, paragraph 13 of the fruit handling agreement granted Stadelman Fruit liquidated damages in the sum of one hundred and twenty percent of the ordinary handling and marketing fees Stadelman Fruit would have received from the crop. Finally, paragraph 14.2 of the agreement

6

granted the prevailing party recovery of reasonable attorney fees and costs in the event of litigation between the parties.

On the same day he signed the fruit handling agreement, Jim Voorhies executed two mortgages to secure Stadelman Fruit's advances. The first mortgage encumbered two parcels of Voorhies' real property, and the second burdened Voorhees' interest in a real estate contract. Voorhies ultimately defaulted on the real estate contract, which left only the mortgage on the real property as security.

The mortgage covered repayment of Stadelman Fruit's advances and read:

> [T]o secure the payment of all sums due Mortgagee [Stadelman Fruit] pursuant to the crop handling agreement of even date herewith between Mortgagor [Jim Voorhies] and Mortgagee, including all sums advanced to provide crop financing for the crop to be grown upon the following described real estate, situated in the County of <u>Yakima</u>, State of Washington:
>
> <u>PARCEL A</u>:
> The West half of the West half of the Northwest quarter of Section 23, Township 14 North, Range 17, E.W.M.,
> EXCEPT the right of way for County Road along the North line thereof.
> (Assessor's Parcel No. 171423-22002)
>
> <u>PARCEL B</u>:
> The East half of the West half of the Northwest quarter of Section 23, Township 14 North, Range 17, E.W.M.,
> EXCEPT right of way for County Road along the North line thereof.
> (Assessor's Parcel No. 171423-22001)
>
> To secure the performance of each agreement of the mortgagor herein contained and the payment of all sums due Mortgagee in providing crop financing for the 2008 crop to be grown upon said premises, including

all renewals, modifications, and extensions thereof, and also such additional
sums as shall be agreed upon.

CP at 84-85.

Stadelman Fruit handled all of Jim Voorhies' crops for the 2008, 2009, and 2010 years. During this period, Stadelman Fruit advanced $575,252.95 to Voorhies. Stadelman Fruit received $464,080.22 in receipts from Voorhies' apples to offset the advances, which left an overdue balance of $111,172.73. Notice that the proceeds from Jim Voorhies' crop failed to pay the advances and Stadelman Fruit's expenses, such that Voorhies never received any profit. Jim Voorhies testified that the parties never reached an agreement or understanding that the mortgage on his land extended to crop years 2009 and 2010.

Stadelman Fruit also paid off a $42,380.92 senior lien and property taxes totaling $23,831.88 on the mortgaged land. Those payments raised the debt owed by Voorhies to Stadelman Fruit to the total sum of $177,385.53. Presumably because of the debt Jim Voorhies owed Stadelman Fruit, Stadelman Fruit refused to loan further sums to Jim Voorhies in 2011, but insisted that Voorhies deliver his 2011 crop to Stadelman Fruit.

PROCEDURE

On July 25, 2011, Stadelman Fruit initiated this suit to foreclose on its mortgage. In his answer, Jim Voorhies asserted that Stadelman Fruit was negligent and failed to follow Voorhies' instructions in packing and selling the crop, which neglect artificially

8

deflated prices. Voorhies also complained of Stadelman Fruit's accounting and claimed that the company engaged in deceptive acts in violation of the Consumer Protection Act, chapter 19.86 RCW. Voorhies, in his answer, admitted he executed the mortgage and agreed Stadelman Fruit handled his fruit from 2008-2010.

Stadelman Fruit and Jim Voorhies filed cross motions for summary judgment. Tim Welch, Stadelman Fruit's chief financial officer, filed a declaration to address Voorhies' accounting concerns. Although Jim Voorhies alleged in a counterclaim that Stadelman Fruit negligently handled, packed, and marketed Voorhies' fruit, Voorhies did not assert any facts supporting a claim of negligence in response to Stadelman Fruit's summary judgment motion. The trial court granted Stadelman Fruit's summary judgment motion in its entirety. The trial court awarded Stadelman Fruit $103,632.95 in prejudgment interest and $93,667.05 in attorney fees and costs.

LAW AND ANALYSIS

*Issue 1: Whether the agreement between Stadelman Fruit and Jim Voorhies requires Voorhies to pay to Stadelman Fruit any deficiency after applying the proceeds from the sale of Voorhies' crop to debt owed Stadelman Fruit?*

*Answer 1: Yes.*

Jim Voorhies claims that he never agreed to pay any shortfall of money resulting from the proceeds of his crop failing to retire the debt incurred to Stadelman Fruit for advances and handling charges. Jim Voorhies does not posit that this argument raises a

9

question of fact. Instead, he asserts that one party should prevail as a matter of law based on the language of the fruit handling agreement. Voorhies argues he should prevail because the fruit handling agreement lacks any language requiring his payment of any shortfall of sums advanced. We disagree.

A reviewing court attempts to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. *Max. L. Wells Trust v. Grand Central Sauna & Hot Tub Co. of Seattle*, 62 Wn. App. 593, 602, 815 P.2d 284 (1991). The critical language in the fruit handling agreement arises in paragraph 7 that addresses advances. The language dictates:

> If Handler has agreed to make an advance to Grower, Grower hereby agrees to execute any security agreement, promissory note, financing statement, and other documents deemed reasonable and necessary by Handler to ensure the *repayment* of such advances . . . .

CP at 77 (emphasis added). Although the language does not expressly require repayment of any shortfall, the language does not declare that Stadelman Fruit waives any right to repayment of the deficiency. Stadelman Fruit could demand that Jim Voorhies sign a promissory note for debt owed and this provision would serve no purpose if Jim Voorhies lacked an obligation to pay any deficiency after a credit for sale proceeds.

Jim Voorhies emphasizes that paragraph 7 of the fruit handling agreement refers to "advances," rather than "loans." Nevertheless, Voorhies provides no authority to

10

distinguish between a loan and an advance and does not explain why advances need not be paid in full.

Jim Voorhies also highlights that he never signed a promissory note and Stadelman Fruit never asked him to sign a note. Voorhies does not provide any authority, however, establishing that a promissory note must evidence a debt in order that the debtor become obligated to pay the debt. To the contrary, an "account" or a debt need not be evidenced by any writing or promise to pay. *In re Stratman's Estate*, 231 Iowa 480, 1 N.W.2d 636, 641-43 (1942).

Jim Voorhies asserts that *Wallace v. Kuehner*, 111 Wn. App. 809, 46 P.3d 823 (2002), requires a ruling in his favor. In *Wallace*, a father loaned his daughter money. Thereafter the father discarded the promissory note and declared that, if his daughter lost the money loaned, the amount would be taken from her inheritance. The court ruled that the father could not recover on the debt because of the agreement to collect the money only by deducting the sum from the daughter's inheritance. Jim Voorhies supplies no testimony that Stadelman Fruit ever agreed to forgo amounts owed to it for the crop years 2008, 2009, and 2010.

Jim Voorhies provided some testimony that Stadelman Fruit a decade earlier agreed to take any default in payment from the next year's crop. We note that such a waiver of amounts owed occurred only after the sale of the crop. Voorhies provides no testimony that Stadelman Fruit waived payment after the sale of the 2008, 2009, or 2010

crops. Also, on appeal, Voorhies does not argue or provide authority that the earlier practice constituted a custom that bound Stadelman Fruit in later years. Anyway, the agreement in the earlier years was that Voorhies would deliver additional fruit to pay for the debt. Voorhies exhibits no willingness to deliver any further crops to Stadelman Fruit.

This court reviews an order for summary judgment de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). The court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56; *Parkin v. Colocousis*, 53 Wn. App. 649, 653, 769 P.2d 326 (1989). Summary judgment on an issue of contract interpretation is proper when the parties' written intent, viewed in light of the parties' other objective manifestations, has only one reasonable meaning. *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997).

We conclude that the fruit handling agreement bears only one reasonable meaning. Jim Voorhies does not provide extrinsic testimony that clashes with that meaning. Voorhies agrees the meaning of the fruit handling agreement creates only a question of law.

*Issue 2: Whether the mortgage secured debt for crops years after crop year 2008?*

*Answer 2: Yes.*

12

Jim Voorhies argues that the mortgage he signed in March 2008 did not extend to any debt owed for the 2009 and 2010 crops. Since crops delivered to Stadelman Fruit in 2008 and the beginning of 2009 retired the 2008 debt, Voorhies contends that debt no longer encumbers his property through the mortgage. In so arguing, Voorhies relies on his own testimony that the parties never entered an agreement or understanding that the mortgage applied to debt other than debt incurred in 2008. He does not testify, however, that the parties ever expressly concurred that the mortgage did not cover debt beyond crop year 2008. He provides no testimony that the parties bespoke about what crop years the mortgage controlled. We deem the question of the debt covered by the mortgage to be controlled by the language of the mortgage and fruit handling agreement.

The mortgage signed by Jim Voorhies in March 2008 posited that it secured "the payment of all sums due [Stadelman Fruit] in providing crop financing for the 2008 crop to be grown upon said premises, including all renewals, modifications, and extensions thereof, and also such additional sums as shall be agreed upon." CP at 85. The debt created by advances in 2009 and 2010 could be considered renewals or modifications. But we need not base our decision on such a conclusion since the 2009 and 2010 debt resulted from such "additional sums as shall be agreed upon." CP at 85. The language does not require that both parties agree that the mortgage will secure additional sums, only that the parties agree to additional sums provided by Stadelman Fruit for crop financing. Jim Voorhies obviously agreed to the sums advanced in 2009 and 2010 or he

13

would not have accepted the funds.

*Issue 3: Whether Jim Voorhies owes interest on the debt owed to Stadelman Fruit?*

*Answer 3: Yes.*

Jim Voorhies next contends that the fruit handling agreement does not afford

Stadelman Fruit interest on any debt owed. Nevertheless, an agreement need not

expressly provide for interest on any debt for interest to be owed. RCW 19.52.010 reads,

in part:

> (1) Every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of twelve percent per annum where no different rate is agreed to in writing between the parties. . . .

The statute applies to advances from one party to another. *Hewitt v. Jones*, 149 Wash.

360, 364-65, 271 P. 76 (1928); *Puget Sound Telephone Co. v. Telechronometer Company*

*of America*, 130 Wash. 468, 481, 227 P. 867 (1924).

Stadelman Fruit charged Jim Voorhies for interest from the date it filed its

complaint. Voorhies provided the trial court no countervailing calculation for interest

owed. The trial court correctly granted interest to Stadelman Fruit.

*Issue 4: Whether Jim Voorhies created a genuine issue of material fact regarding*

*the accounting provided by Stadelman Fruit as to amounts owed?*

*Answer 4: No.*

Next, Jim Voorhies claims Stadelman Fruit failed to account for all of Voorhies'

apple revenue in the company's accounting. Stadelman Fruit included in its July 2011

14

complaint an accounting summary, which included statements listing the advances made, costs incurred, and sale proceeds received by Stadelman Fruit. Voorhies never then challenged the accounting.

As part of this lawsuit, Jim Voorhies avers that Stadelman Fruit did not credit three bins of apples and thereby failed to account for $26,014.74 in revenue during 2008. Nevertheless, Stadelman Fruit's Chief Financial Officer Tim Welch's declaration and attached accounting establishes that Stadelman Fruit credited Voorhies for the purported missing pool returns totaling $26,014.74.

Jim Voorhies contends that Stadelman Fruit's accounting for his individual return for 2009 shows a "net" of $25,954.75, while the "pool return" shows a net credit to his account of $61,662.89, a difference of $35,708.14. Tim Welch addressed this concern. Voorhies misreads the pool and grower statements. Welch observed:

> In sum, both statements are wholly consistent as to the revenue and charges to Pool 4, that is, Mr. Voorhies' apples, and that analysis is quite simple. That is, the apples in Pool 4 returned $88,118.91 in gross revenue, Pool 4 was therefrom charged with $62,164.14 in packing/storage charges, and the difference of $25,954.75 was credited to Mr. Voorhies account. The matter raised by Mr. Voorhies only serves to cause confusion as he refers to the Pool Statement's listing of internal accrual/cost type accounting entries used by Stadelman in the management of its operation and confuses that the "net amount credited to your account" is referring to Stadelman (and not Mr. Voorhies) as Stadelman is the intended user of the "Pool Statement."

CP at 460-61. Tim Welch's declaration demonstrates the pool returns to which Voorhies refers actually are from 2010.

Jim Voorhies next complains Stadelman Fruit did not credit him $11,896.11 in 2010. Nevertheless, Tim Welch's declaration establishes that Stadelman Fruit credited Voorhies with the correct amount and Voorhies again misread the accounting statements. Although Stadelman Fruit initially omitted the income in its accounting, the company later credited, as shown in records attached to Welch's declaration, the full $11,896.11.

*Issue 5: Whether any facts can sustain Jim Voorhies' claim under the Consumer Protection Act?*

*Answer 5: No.*

Jim Voorhies also alleges the trial court incorrectly dismissed the Washington Consumer Protection Act counterclaim. The five elements of a private Consumer Protection Act action include: (1) an unfair or deceptive act or practice, (2) in the conduct of trade or commerce, (3) which impacts the public interest, (4) injury to the plaintiffs in their business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered. *Mason v. Mortgage America, Inc.*, 114 Wn.2d 842, 852, 792 P.2d 142 (1990).

Jim Voorhies highlights purported accounting inaccuracies to contend that Stadelman Fruit's bookkeeping constituted an unfair practice that could impact other growers with whom Stadelman Fruit conducted business. But we have concluded no facts show any accounting error.

*Issue 6: Whether the independent duty doctrine bars Jim Voorhies' negligence*

*claim?*

*Answer 6: We need not address this issue since Voorhies no longer claims*

*Stadelman Fruit performed negligent acts.*

Jim Voorhies claims the independent duty doctrine, contrary to the trial court's

ruling, does not bar his negligence claim. To the extent the independent duty doctrine

still exists, the doctrine may bar a party to a contract from asserting a tort theory against

the other contracting party. *Alejandre v. Bull*, 159 Wn.2d 674, 683, 153 P.3d 864 (2007).

In response to Stadelman Fruit's summary judgment motion to grant it judgment

for debt owed and to dismiss Jim Voorhies' counterclaims for Consumer Protection Act

violations and negligence, Voorhies raised no facts supporting his negligence theory.

During oral argument before this court, Voorhies, in response to questioning as to

whether he still asserted a negligence claim, answered that no negligence was asserted

before the trial court. Since Voorhies no longer asserts a claim of negligence, we need

not address whether the independent duty doctrine bars any claim.

*Issue 7: Whether this court should grant Stadelman Fruit reasonable attorney fees*

*and costs incurred on appeal?*

*Answer 7: Yes.*

Both Jim Voorhies and Stadelman Fruit request reasonable attorney fees according

to the attorney fees clause in the fruit handling agreement. Pursuant to RAP 18.1, we

grant Stadelman Fruit, as the prevailing party, reasonable attorney fees and costs incurred

17

No. 35165-3-III
*Stadelman Fruit, LLC v. Voorhies*

on appeal.

CONCLUSION

We affirm the trial court's grant of summary judgment in favor of Stadelman Fruit

for amounts owed, for foreclosure of the mortgage, and for dismissal of Jim Voorhies'

counterclaims. We grant Stadelman Fruit reasonable attorney fees and costs incurred on

appeal.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.

18